**In re: Mark A. BULSON and Judith A. Bulson, Debtors.**

**No. HG 03–13905.**

United States Bankruptcy Court,
W.D. Michigan.

May 27, 2005.

Paul B. Newman, Esq., Newaygo, Michigan, for Debtors.

Kim M. Rattet, Esq., Bingham Farms, Michigan, for Countrywide Home Loans, Inc.

James W. Batchelor, Esq., Grand Rapids, Michigan, for Countrywide Home Loans, Inc.

### OPINION RE: MOTION TO RECONSIDER FILED BY COUNTRYWIDE HOME LOANS, INC.

JEFFREY R. HUGHES, Bankruptcy Judge.

On August 6, 2004, Countrywide Home Loans, Inc. ("Countrywide") filed a motion entitled "Countrywide Home Loan, Inc.'s Motion to Reconsider the Judgment and Order Confirming Plan Entered on July 27, 2004." For the reasons stated in this

opinion, Countrywide's motion is denied. However, for the reasons also stated in this opinion, I exercise my own authority pursuant to 11 U.S.C. § 105(a) to revoke the confirmation order and to dismiss this Chapter 13 proceeding.

## JURISDICTION

I have jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and LBR 83.2 (W.D.Mich.). This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(L). Therefore, my decision constitutes a final order that may be appealed to the District Court for the Western District of Michigan pursuant to 28 U.S.C. § 158.

## PROCEDURAL BACKGROUND

On November 17, 2003, Mark and Judith Bulson filed a petition for relief under Chapter 13 of the Bankruptcy Code. Confirmation of the Bulsons' Chapter 13 plan was first scheduled for hearing on March 26, 2004. However, the confirmation hearing was adjourned to April 15, 2004, and then adjourned again to May 27, 2004. The second adjournment was accompanied by what I refer to as a "no adjournment order." That order prohibited all parties, including the Bulsons, from adjourning the confirmation hearing beyond the May 27, 2004 date without cause being shown.

The Bulsons filed their original Chapter 13 plan at the same time that they filed their petition for relief. However, the Bul-sons amended their plan on two separate occasions prior to the May 27, 2004 confirmation hearing.[1] They filed their first amended plan on February 20, 2004 (the "February 20 amended plan") and they filed their second amended plan on May 19, 2004 (the "May 19 amended plan").

The Bulsons' February 20 amended plan treated Countrywide as a secured creditor whose rights could be modified pursuant to 11 U.S.C. § 1322(b)(2).[2] The Bulsons' February 20 amended plan bifurcated Countrywide's total claim, which Debtors scheduled at $119,500, into a secured claim of $107,000 and an unsecured, non-priority claim for the balance. The February 20 amended plan further provided that Countrywide's $107,000 secured claim would accrue interest at 5.25% per annum and that it would amortize at $500 per month for the life of the plan and then at $600 per month thereafter.

However, the Bulsons' May 19 amended plan proposed a much more severe modification of Countrywide's secured claim. In fact, the Bulsons' May 19 amended plan proposed to treat Countrywide's entire claim as unsecured. The Bulsons' reason for invalidating Countrywide's mortgage was that Countrywide could not "produce the original of Mark A. Bulson's mortgage note duly endorsed to it."[3]

The Bulsons' May 19 amended plan was not confirmable. First, the plan,

---

1. A debtor may modify his Chapter 13 plan at any time before confirmation. 11 U.S.C. § 1323(a). If a debtor does so modify his plan, the plan as modified becomes the plan for purposes of confirmation. 11 U.S.C. § 1323(b).

2. The Bankruptcy Code is set forth in 11 U.S.C. §§ 101–1330. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

3. The Bulsons had also filed an objection to Countrywide's proof of claim on April 14,

2004. The objection paralleled the Bulsons' proposed treatment of Countrywide's claim under their May 19 amended plan. That is, the Bulsons asserted in their April 14, 2004 objection that Countrywide's claim should be allowed as only an unsecured, non-priority claim because Countrywide had failed to include with its proof of claim documents that established Countrywide as the proper assignee of the original note and mortgage executed between Mr. Bulson and Republic Bank.

as then amended, contemplated avoiding or invalidating Countrywide's claimed lien in Mr. Bulson's property. However, the Federal Rules of Bankruptcy Procedure do not permit a debtor to use the Chapter 13 plan confirmation process to accomplish what the Bulsons intended. Generally, the avoidance or invalidation of a creditor's lien requires the commencement of an adversary proceeding with the attendant service of a complaint and summons upon the affected creditor. Fed.R.Bankr.P. 7001(2).[4] *See also, In re Fuller,* 255 B.R. 300 (Bankr.W.D.Mich.2000).[5]

■ Second, even if the Bulsons were able to invalidate Countrywide's lien through the confirmation process, the Bulsons had not given Countrywide sufficient notice of the proposed change in treatment of its claim under their amended plan. The court's docket indicates that the Bulsons served the May 19 amended plan upon Countrywide by mail on May 18, 2004. Consequently, the Bulsons had given Countrywide only nine (9) days notice of the revised plan that was to be considered for confirmation at the May 27 hearing. That notice was clearly inadequate.[6]

The Bulsons' inability to confirm their May 19 amended plan at the May 27, 2004 hearing created a dilemma for the Bulsons because I also refused to give the Bulsons any additional time to seek confirmation of a plan in their Chapter 13 proceeding. As already indicated, the May 27, 2004 hearing was the second adjournment of a confirmation hearing originally scheduled for February 26, 2004. The Bulsons had been forewarned by the "no adjournment order" served on April 20, 2004 that further adjournment of the confirmation hearing beyond the May 27, 2004 date would not be permitted unless cause were shown.

The Bulsons solved the dilemma by withdrawing their May 19 amended plan from consideration and by requesting instead that their February 20 amended plan be confirmed. The February 20 amended plan did not suffer from the same procedural defects as did the Bulsons' May 19 amended plan. Therefore, I permitted the

---

**4.** The Federal Rules of Bankruptcy Procedure are set forth in Fed.R.Bankr.P. 1001–9036. Unless otherwise noted, all further references to rules are to the Federal Rules of Bankruptcy Procedure.

**5.** The Bulsons' objection to Countrywide's proof of claim was also scheduled for hearing on May 22, 2004. I denied the objection without prejudice. For all practical purposes, the Bulsons' objection to Countrywide's proof of claim was the same as the Bulsons' proposed treatment of Countrywide under their May 19 amended plan. The objective of each was to invalidate Countrywide's lien in Mr. Bulson's property. Consequently, the Bulsons' objection to Countrywide's proof of claim suffered from the same procedural defect as the Bulsons' effort to invalidate Countrywide's lien through the Chapter 13 confirmation process. Fed.R.Bankr.P. 7001(2) required the Bulsons to commence an adversary proceeding to invalidate Countrywide's asserted lien. Objecting to Countrywide's proof of claim pursuant to 11 U.S.C. § 502(b) and the related rules was not an acceptable substitute.

**6.** The Federal Rules of Bankruptcy Procedure do not actually specify the required notice period for pre-confirmation plan amendments under Section 1323. However, the rules do require that either the debtor's Chapter 13 plan or a summary of the plan accompany the notice of confirmation hearing with respect to the debtor's Chapter 13 proceeding and that that notice be given at least twenty-five days before the time set for the confirmation hearing. Fed.R.Bankr.P. 3015(d) and 2002(b). In addition, creditors must receive at least twenty days notice of a proposed post-confirmation modification of the debtor's Chapter 13 plan. Fed.R.Bankr.P. 3015(g). The custom in this district is that debtors give the same twenty day notice for pre-confirmation modifications.

Bulsons to proceed with the May 27, 2004 confirmation hearing on that basis.

The Chapter 13 trustee recommended that I confirm the Bulsons' February 20 amended plan.[7] However, that recommendation was subject to the resolution of Countrywide's separate objection to the confirmation of the February 20 amended plan. Countrywide objected to confirmation of that amended plan because it purportedly contravened the provisions of Chapter 13. 11 U.S.C. § 1325(a)(1). Specifically, Countrywide contended that the February 20 amended plan could not be confirmed because Countrywide was a home mortgage lender and, therefore, its rights could not be modified by the Bulsons' plan. 11 U.S.C. § 1322(b)(2).

I heard Countrywide's objection on the same day. After considering both Countrywide's and the Bulsons' arguments, I concluded that Countrywide's rights were subject to modification pursuant to Section 1322(b)(2) and, therefore, the February 20 amended plan could be confirmed over Countrywide's objection.

The Chapter 13 trustee was asked to prepare a proposed order at the conclusion of the hearing. However, for some reason, the proposed order was not submitted un-til July 16, 2004. I signed the order on July 23, 2004.

On August 6, 2004, Countrywide filed a motion to reconsider my May 27, 2004 decision to confirm the Bulsons' February 20, 2004 amended plan over Countrywide's objection. I interpret Countrywide's motion as being brought pursuant to Rule 9023(e). Countrywide's request is that I change the July 23, 2004 order confirming the Bulsons' February 20 amended plan to one that denies confirmation of that plan.

## DISCUSSION

### A. *Timeliness of Countrywide's Rule 9023(e) Motion.*

■ The Bulsons argue that Countrywide did not file its motion within the 10–day period required by Rule 9023(e). That rule provides that, "[a]ny motion to alter or amend a judgment must be filed no later than 10 days after entry of the judgment." In this context, "judgment" means the confirmation order. Fed.R.Bankr.P. 9001(7).

The order I signed on July 23, 2004 did not immediately appear on the court's docket as the order confirming the Bulsons' February 20 amended plan. Instead, a "text order" appeared on the docket.[8]

7. The custom in this district is for the Chapter 13 trustee to appear at the confirmation hearing and either recommend the proposed plan for confirmation or oppose its confirmation. If the Chapter 13 trustee recommends a Chapter 13 plan for confirmation, the Chapter 13 trustee is affirmatively representing that the plan, in his opinion, conforms with the confirmation standards of Section 1325 and that, to the best of his knowledge, he is not aware of any objection to the confirmation of that plan. The Chapter 13 trustee also establishes with his recommendation that the plan to be confirmed is the plan as amended as of the day of confirmation to the extent any amendment has been made to that plan.

However, the Chapter 13 trustee's recommendation is only evidentiary. It is the debt-or's duty to file a Chapter 13 plan, 11 U.S.C. § 1321, and the burden lies with the debtor to establish that the plan presented for confirmation meets the confirmation standards of 11 U.S.C. § 1325. *In re Nosker,* 267 B.R. 555, 559 (Bankr.S.D.Ohio 2001). The Chapter 13 trustee's recommendation to confirm a plan is in effect nothing more than an offer of proof on behalf of the debtor which, at least in an uncontested setting, is sufficient to meet the debtor's evidentiary burden with respect to confirmation of his plan.

8. The court recently converted its files from paper to an electronic format. That conversion has prompted, and will continue to prompt, changes to how documents filed with the court or generated by the court will be

Entry of the text order was a mistake. The court corrected its mistake by later entering the order I had actually signed on July 23, 2004.

The docket entry for the text order is No. 41 and the docket entry for the actual order is No. 43. To the immediate left of each entry is the date "07/23/04." The Bulsons' contend that the 10–day time period for Countrywide to file its Rule 9023(e) motion ran from that date. Therefore, the Bulsons' argue that Countrywide's August 6, 2004 motion was untimely.

However, July 23, 2004 is not the date either of these orders was entered. Rather, the docket clearly indicates that the text order was entered, albeit mistakenly, on July 27, 2004 and the order I actually signed was entered on August 6, 2004. Consequently, Countrywide's Rule 9023(e) motion is timely regardless of which order is relied upon to measure the requisite 10–day period.

**B.** *Reconsideration of Confirmation Order Based Upon Countrywide's Anti–Modification Objection.*

 Rule 9023 parallels Fed.R.Civ.P. 59. Courts should not grant motions brought pursuant to either rule as a matter of course.

> Motions for a new trial or to alter or amend a judgment must clearly establish either a manifest error of law or fact

or must present newly discovered evidence. *Keene Corp. v. International Fidelity Ins. Co.,* 561 F.Supp. 656 (N.D.Ill. 1982), *aff'd,* 736 F.2d 388 (7th Cir.1984). These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued. *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill.1976). Moreover, they cannot be used to argue a case under a new legal theory. *Keene,* 561 F.Supp. at 666; *Evans,* 416 F.Supp. at 244.

*Fed. Deposit Ins. Corp. v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986).

**1.** *Background*

Mr. Bulson owns a parcel of real property in Holton, Michigan. Mr. Bulson mortgaged the Holton property to Republic Bank in March 2003 to secure an indebtedness owing to Republic Bank.[9] Countrywide claims that it is the assignee of Republic Bank's rights under that indebtedness and mortgage.

Countrywide objected to the confirmation of the Bulsons' February 20 amended plan because the plan contemplated the modification of Countrywide's rights as a mortgage lender on the Holton property. Generally, a Chapter 13 debtor may modify the rights of secured lender as part of his Chapter 13 plan. 11 U.S.C. § 1322(b)(2). However, a Chapter 13 debtor may not modify the secured lender's rights if the lender's claim is "secured

---

docketed. One innovation is the "text order." Ordinarily, the electronic docket maintained by the court for a particular bankruptcy proceeding includes only a description of the order. The electronic image of the order itself is then linked to the docket entry so that a party may view the order if so desired. However, a "text order" does not include a linked image of the order. Rather, the order is incorporated into the docket entry itself. Text orders are used by this court to reflect the court's confirmation of Chapter 13 plans

and other routine actions. The value of a text order is that it permits the court to place both the docket entry and the order onto the electronic docket without having to take the additional step of linking an image of an actual order to the electronic docket entry.

**9.** The parties apparently agree that Mr. Bulson is the sole owner of the Holton property and that he is the sole obligor and mortgagor with respect to the Countrywide loan.

only by a security interest in real property that is the debtor's principal residence." *Id.*[10]

It is quite likely that I would not have confirmed the Bulsons' February 20 amended plan had only Mr. and Mrs. Bulson resided on the Holton property. However, Mr. Bulson's mother also resided on the Holton property. Consequently, the Bulsons contended that they could modify Countrywide's rights because the real property securing Countrywide's loan encompassed more than only the Bulsons' principal residence.

### 2. *Alleged Factual Error*

■ Countrywide contends that I erred in my conclusion that its mortgage rights did not fall within the "anti-modification" exception to Section 1322(b)(2) because I made factual findings that were not supported by the record. However, I made my findings based upon the following undisputed facts:

- The only collateral securing Countrywide's loan to Mr. Bulson was Mr. Bulson's interest in the Holton, Michigan property.
- The Holton, Michigan property was described and taxed as a single parcel of property.
- Mr. and Mrs. Bulson's residence was located on the Holton, Michigan property.

- Mr. Bulson's mother's residence was also located on the Holton, Michigan property.
- Mr. and Mrs. Bulson resided in one structure on the property and Mr. Bulson's mother resided in another structure.
- The two structures did not share a common wall. However, the structures were attached by a covered walkway.

Countrywide now asserts that there was a dispute as to whether Mr. Bulson's mother lived in a separate structure and that I resolved that dispute in favor of the Bulsons without competent testimony to support such a finding.[11] Countrywide is correct that neither party offered testimony or documentary evidence at the May 27, 2004 confirmation hearing in support of their respective positions. However, Countrywide conveniently ignores the fact that the attorney who represented it at the hearing conceded facts that Countrywide now claims were in dispute.[12] Specifically, Ms. Weddell, as Countrywide's attorney, agreed at the hearing that Mr. Bulson's mother did occupy a separate structure.

THE COURT: Okay. But you're not contesting the representation that there is the second dwelling and that it does stand separate from the other dwelling with the exception of having this covered walkway.

MS. WEDDELL: We agree. Our position, however, is that this is totally

---

**10.** (b) Subject to subsections (a) and (c) of this section, the plan may-

 (2) modify the rights of holders of secured claims, **other than a claim secured only by a security interest in real property that is the debtor's principal residence**, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2) (Emphasis added).

**11.** Countrywide did not include this argument in its original August 6, 2004 motion. How-

ever, Countrywide has made this argument in a "supplemental" motion and brief that it filed on January 29, 2005. Countrywide did not seek leave prior to filing the January 29 motion and brief. Nonetheless, I have read and considered these submissions.

**12.** The law firm of Trott & Trott, PC filed Countrywide's Rule 9023 motion. However, Pamela Weddell, Esq., a sole practitioner, represented Countrywide at the May 27, 2004 hearing.

irrelevant to the confirmation and to our objections to the plan, and the debtors' objection to our proof of claim.

THE COURT: Why is it irrelevant?

MS. WEDDELL: Because we believe that it is a secured debt and that our— the amount of our secured debt is the amount as stated in our objection. That this is a primary residence.

THE COURT: And it's a primary residence because these two dwellings should be treated as one dwelling because of the walkway connecting the two.

MS. WEDDELL: That's not the only reason but, yes, your Honor.

Transcript, 5/27/04 hearing, p. 23.

If Ms. Weddell was not sure of Countrywide's position with respect to the configuration of the two residences on the Bulsons' property, then she should not have conceded this issue at the hearing. It is too late to now claim that Ms. Weddell was somehow mistaken as to facts which were clearly pertinent to her representation of Countrywide at the May 27, 2004 hearing.

It is also inappropriate for Countrywide to assert at this juncture that the record should be reopened to allow consideration of various documents it attached to its August 6, 2004 motion. Countrywide does not contend that any of these documents were recently discovered or that Countrywide was not otherwise in a position to offer these documents as evidence at the May 27, 2004 hearing. Countrywide did not even ask at the May 27, 2004 hearing to adjourn to a later date so that it could have the opportunity to offer proofs as to what structures were actually on the Holton property and how these structures were configured. Instead, Countrywide, through its attorney, Ms. Weddell, agreed with the Bulsons that there were two separate residences on the property connected by a covered walkway. Consequently,

whatever documents or testimony Countrywide has to supports its current contention regarding the configuration of the two structures is irrelevant even if proofs were to be reopened.

Therefore, for the reasons stated, Countrywide's motion to set aside the confirmation order because it is not factually supported or because additional proofs should have been considered is denied.

### 3. *Alleged Legal Error*

Setting the boundaries of the "home mortgage" exception to Section 1322(b)(2) has proven to be a remarkably difficult task. Most, if not all, courts agree that a lender whose only collateral is a single family home on a city or suburban residential lot fits within the exception. However, there is wide disagreement as to a lender's eligibility for the exception when the debtor's residence is one unit in a duplex or apartment building or when the debtor's residence is situated on a parcel much larger than what is customary for a residence (*e.g.*, a farm). Indeed, the challenge is so great that three different bankruptcy judges for the Western District of New York have adopted three different approaches for determining whether a lender's mortgage claim in a multi-family building in which the debtor resides is eligible for the exception or not. Compare *Brunson v. Wendover Funding, Inc. (In re Brunson)*, 201 B.R. 351 (Bankr.W.D.N.Y. 1996); *In re Kimbell*, 247 B.R. 35 (Bankr. W.D.N.Y.2000); and *In re Macaluso*, 254 B.R. 799 (Bankr.W.D.N.Y.2000).

The courts have struggled with the scope of the "home mortgage" exception because Congress has left them with a task that courts are not accustomed to performing. As a general proposition, Congress enacts the bankruptcy laws and the courts then enforce those laws. How-

ever, enforcement of a lien is seldom a mechanical process. The English language is rich and nuanced. Consequently,courts often must interpret the words chosen by Congress. Courts are regularly called upon to reconcile apparent conflicts between related provisions, to resolve ambiguous words or phrases, or to consider even the placement of punctuation.

The words chosen by Congress in this instance are plain enough in meaning. The exception is limited to claims "secured only by a security interest in real property that is the debtor's principal residence." Unfortunately, the devil is in the definition. Specifically, Congress left undefined the phrase "real property that is the debtor's principal residence."

Frankly, I am surprised that Congress left a definitional gap like this in Section 1322(b)(2). The Bankruptcy Code is replete with phrases similar to "real property that is the debtor's principal residence." For example, Section 109(f) refers to a "family farmer with regular annual income" and Section 362(d)(3) refers to "single asset real estate." However, in each of these instances, Congress also gave further definition to these phrases. "Family farmer with regular annual income" means:

> (19) . . . family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title;

11 U.S.C. § 101(19).

"Single asset real estate" means:

> (51B) . . . real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000;

11 U.S.C. § 101(51B).

I attribute the lack of a statutory definition for "real property that is the debtor's principal residence" simply to oversight on the part of Congress. The legislative history of the home mortgage exception is set forth in *Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1, 4–5 (1st Cir.1996). The original version of Section 1322(b)(2) passed by the House of Representatives included no exception to the modification powers otherwise given to the Chapter 13 debtor in that subsection. In other words, the House version empowered a Chapter 13 debtor to modify the rights of any secured creditor. It made no difference whether the secured creditor's claim was collateralized by real or personal property or whether the real property mortgaged was the debtor's residence or a strip mall.

In contrast, the Senate's version of Section 1322(b)(2) did include an exception. Its version permitted a Chapter 13 debtor to modify the rights of a secured creditor whose collateral consisted of either all personal property or a combination of personal and real property. However, the Senate version carved out a broad exception for all secured creditors whose claims were secured "wholly . . . by mortgages on real property."

The two versions of Section 1322(b)(2) were reconciled by the conference committee. The committee's compromise was to replace the complete exclusion of real estate lenders contemplated in the Senate version with the limited exclusion of only home mortgage lenders. Unfortunately, last minute compromises are seldom supported by technical analysis or even reflective thought. It appears that the compro-

mise bill was passed by both houses and signed by the President without anyone considering the consequences of changing the anti-modification exception from the easily determined exception of all real estate mortgages to the much more vague notion of only real estate mortgages involving the debtor's principal residence.

■ Some courts have attempted to solve the definitional problem posed by Section 1322(b)(2)'s home mortgage exception by creating a checklist of factors to be considered. For example, *Brunson v. Wendover Funding*, a case cited extensively by Countrywide in its brief, concludes that "real property that is the debtor's principal residence" is to be determined on a case-by-case basis, *Brunson*, 201 B.R. at 353. *Brunson* then offers a laundry list of factors a court should consider.

> The types of factors that the Court should consider are: whether the Debtor (to the lender's knowledge) owned other income producing properties or other properties in which she could choose to reside; whether she had a principal occupation other than as landlord, and the extent to which rental income or other business income produced from the real estate contributed to her income; whether her total income was particularly high or particularly low; whether the mortgage was handled through the commercial loan department or the residential mortgage loan department of the lender; whether the interest rates applied to the mortgage were home loan rates or commercial loan rates; the demographics of the market (e.g., are "doubles" a much more affordable "starter home" than a single, in that locale); and the extent to which, and purpose for which, potential business uses of the land (such as farming) were considered by the lender. **There surely may be others.**

*Id.* (Emphasis added). *See also, Litton Loan Servicing, LP v. Beamon,* 298 B.R. 508, (N.D.N.Y.2003); *In re Scarborough,* 2004 WL 2431544 (E.D.Pa.).

However, the case-by-case approach advocated by these courts does not stand up well when considered against Congress' purpose in creating the home mortgage exception to Section 1322(b)(2). The Sixth Circuit itself had the opportunity to discuss that purpose in *Federal Land Bank of Louisville v. Glenn (In re Glenn),* 760 F.2d 1428 (6th Cir.1985).

> One of the significant specific changes introduced by Congress in the new legislation was to allow modification of the contract rights of secured creditors under a Chapter 13 plan. H.R.Rep., *supra,* at 124; Bankruptcy Laws Commission's Report, H.R.Doc. 137, pt. 2, 93rd Cong., 1st Sess. 205 (1973). Nevertheless, it is evident upon examining the final language of section 1322(b)(2) that Congress contemplated a different treatment of debts secured only by mortgages on the debtor's principal residence. One would think that when trying to liberalize the relief to debtors under Chapter 13, Congress would be particularly solicitous of the individual wage earner's ability to save his home. However, it is apparent from the language of section 1322(b) that Congress intended to give a preferred status to certain types of home mortgagees and lienholders, a policy which at first blush would seem at odds with the general thrust of the new act. The question naturally arises: why? The legislative history says little in terms of political or social philosophy as such. However, it does reveal that the final language of section 1322(b) evolved from earlier language, incorporated in the bill apparently at the behest of representatives of the mortgage market, that would have prohibited

modification of the rights of all creditors whose claims were wholly secured by mortgages on real property. Although the earlier language did not survive, the statute as finally enacted by Congress clearly evidences a concern with the possible effects the new bankruptcy act might have upon the market for homes. If any other policy objective of Congress was adequate to compete against the objective of protecting wage earners generally, it was a policy to encourage the increased production of homes and to encourage private individual ownership of homes as a traditional and important value in American life. Congress had to face the reality that in a relatively free society, market forces and the profit motive play a vital role in determining how investment capital will be employed. Every protection Congress might grant a homeowner at the expense of the holders of security interests on those homes would decrease the attractiveness of home mortgages as investment opportunities. And as home mortgages decrease in attractiveness, the pool of money available for new home construction and finance shrinks.

On the other hand, Congress was determined not to depart too far from its expressed policy of making wage earner plans more attractive to debtors, especially as an alternative to full bankruptcy proceedings under Chapter 7. Therefore, the preferred status granted some creditors under section 1322(b)(2) was limited to holders of claims secured *only* by a security interest in the debtor's principal residence. No preferential treatment was given debts secured by property in addition to the debtor's principal residence. Such debts normally are incurred to make consumer purchases unrelated to the home or to enable the debtor to engage in some form of business adventure. In such circumstances the home is mortgaged not for its own sake, but for other purposes, and often is only one of several forms of security given. In a consumer purchase the creditor may also take a security interest in the goods purchased, or in a business transaction, the value of the home may be an insufficient security and, therefore, form only a part of the security package. Congress granted no extra protection for holders of these types of secured claims, presumably because any impact the bankruptcy laws might have upon them would not seriously affect the money market for home construction or purchase.

*Id.* at 1433–34 (footnotes omitted). *See also, Nobelman v. American Sav. Bank,* 508 U.S. 324, 332, 113 S.Ct. 2106, 2111–12, 124 L.Ed.2d 228 (1993) (Stevens, J., concurring); *Litton Loan Servicing LP v. Beamon,* 298 B.R. 508, 511 (Bankr. N.D.N.Y.2003); *In re Scarborough,* 2004 WL 2431544, *4 (E.D.Pa.).

Put simply, Congress' intent in adding the "home mortgage" exception to Section 1322(b)(2) was "to encourage the flow of capital into the lending market.". *Litton Loan Servicing,* 298 B.R. at 512 (quoting from *Nobelman,* 508 U.S. 324, 332, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (Stevens, J. concurring)). However, if this was Congress' intent, then one must ask whether any of the numerous factors referenced in *Brunson* and the other decisions that advocate a case-by-case approach have any relevance at all. For example, what difference does it make to the home mortgage capital market whether an individual borrower's total income "was particularly high or particularly low" or whether the borrower had "a principal occupation other than as a landlord?"

*Brunson,* 201 B.R. at 353.[13]

Indeed, the whole notion of relying upon the totality of the circumstances in each particular case is suspect if the purpose of the anti-modification exception is to prevent Section 1322(b)(2) from deterring investment in the home mortgage capital market. While the courts that have adopted a "totality of the circumstances" approach have acknowledged the broad policy objective underlying the anti-modification exception, their focus is decidedly parochial. In effect, these courts' attention is narrowed to the specific issue of whether the debtor in a particular case should be able to modify the rights of his mortgage lender because of who knows what factors are peculiar to that case. A court's attention to the specifics of a particular case is undoubtedly of interest to the litigants involved in that case. However, it is not clear at all as to how such a case-by-case approach encourages the flow of capital into the home mortgage lending market. To the contrary, the approach is disruptive.

Courts adopting the totality of the circumstances approach criticize other courts which have preferred a more precise definition as being arbitrary, *Litton Loan Servicing,* 298 B.R. at 512, and as shirking an undesirable task. *Brunson,* 201 B.R. at 352. However, a precise definition, even if arbitrary, is exactly what is needed to avoid disruption in the home mortgage capital market. Uncertainty is the one thing that all markets hate. Markets work best when there are clear rules consistently applied. Although investors certainly value fairness, they place an even higher value on certainty. Investors can adjust for inequities. It is much harder to adjust for uncertainty. Deciding whether a particular mortgage falls within the home mortgage exception perhaps years after the fact on a case-by-case basis may ensure an equitable result for the particular debtor and lender involved. However, the home mortgage lending market as a whole pays a price for this result because of the considerable uncertainty such an approach lends to the underwriting decision when home loans are made.

Therefore, I conclude that Congress' design of encouraging the free flow of capital into the home mortgage lending market by excepting home mortgages from Section 1322(b)(2)'s modification provisions can only be accomplished by giving a specific definition to the phrase "real property that is the debtor's principal residence." The task then is to pick from the wide spectrum of candidates the one definition that is most suited to meet Congress' goal.

"Real property that is the debtor's principal residence" certainly lends itself to

---

13. The *Brunson* court justified its case-by-case approach on the theory that:

> . . . each case must turn upon the intention of the parties: Was home-ownership the predominant intention (and rental income simply a means to that end) or was investment income or the operation of a business the predominant purpose of the transaction?

*Brunson,* 201 B.R. at 353. *See also, Litton Loan Servicing,* 298 B.R. at 512; *Scarborough,* 2004 WL 2431544 at *4.

However, there is nothing within the four corners of Section 1322(b)(2) that even remotely suggests that the debtor's intent, let alone the lender's intent, is to have any bearing on the determination of whether a particular claim is "secured only by a security interest in real property that is the debtor's principal residence." Consequently, the judges who have adopted the case-by-case approach stand on no higher ground in our collective effort to give meaning to Section 1322(b)(2)'s home mortgage exception. The challenge is the same for all: What is the definition of "real property that is the debtor's principal residence?" If the parties' intent is to be part of that definition, then hard support for that position must be provided. Hollow pronouncements will not suffice.

any number of definitions. The most expansive would be one that allowed within its scope any integral plot of land, however described or platted, upon which is situated any structure used by the debtor as his principal residence. The real property could be a city lot, three city lots, a quarter acre suburban lot, a five acre suburban lot, or a 500 acre farm. As for the debtor's dwelling on the property, it could be a hut, an affixed mobile home, a 10,000 square foot mansion, one room in a duplex, one apartment in a 4–unit apartment, or one apartment in a 100–unit apartment. How the remaining property and the other structures located on the property were being used or could be used would be irrelevant.

In contrast, perhaps the most restrictive definition would be one that limited the size of the lot (*e.g.*, no greater than one acre) and that limited the structures on that lot to only one single family dwelling unit used by the owner as his principal residence and outbuildings reasonably associated with that use (*e.g.*, a garage). Such a definition would exclude from the home mortgage exception loans collateralized by, for example, homes located on large rural lots, duplexes, and farms.

These two definitions set the limits for an almost limitless number of variations between these two extremes. In addition, there is a temporal aspect to the definition. Is the debtor's use of the pertinent structure determined at the time the loan is made, at the time the debtor files his bankruptcy petition, or at some other time? Finally, there is a question of what constitutes real property for purposes of the definition. Does it include any real property or must the debtor have an ownership interest in it? If the latter, must the ownership interest be the entire fee or may it be an undivided interest in a cotenancy?

The definition I have chosen is a narrow one. It is important not to honor the exception at the expense of the rule. Section 1322(b)(2), as a general proposition, permits the modification of a secured creditor's rights as part of a Chapter 13 debtor's plan. While there is no question that lenders whose security consists only of "real property that is the debtor's principal residence" are not subject to this general rule, there is no reason to give the exception any broader meaning than is necessary to accomplish the purpose sought by including the exception. Indeed, in a broad sense, the right to modify a secured creditor's rights under Section 1322(b)(2) and the availability of a discharge under Section 1328 are simply different aspects of Congress' effort to offer a "fresh start" to debtors through the enactment of bankruptcy laws. It is black letter law that exceptions to a debtor's discharge are to be narrowly construed. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *Meyers v. IRS (In re Meyers),* 196 F.3d 622, 624 (6th Cir.1999). Logic suggests that the same approach should be utilized in giving definition to the home mortgage exception to Section 1322(b)(2).

The First Circuit, in *Lomas Mortgage,* started the process of giving a precise definition to "real property that is the debtor's principal residence." *Lomas Mortgage* involved a 3–family home located on an urban lot in Brockton, Massachusetts. The debtor owned an undivided one-half interest in the subject property and his brother owned the other undivided half. The debtor resided in one of the units, his brother resided in another, and the third unit was leased to tenants.

The mortgage company held a mortgage in all three units and the underlying property. The debtor's Chapter 13 plan contemplated modifying the mortgage

company's rights by "stripping down" the mortgage company's secured claim to the actual value of the subject property and then treating the balance of the mortgage company's claim as unsecured. The mortgage company objected to confirmation of the debtor's plan. The mortgage company asserted that it fell within the home mortgage exception to Section 1322(b)(2) and, therefore, the debtor's plan could not be confirmed.

The First Circuit affirmed the lower court's determination that the mortgage company did not qualify for the home mortgage exception to Section 1322(b)(2). Specifically, the First Circuit held that the home mortgage exception was to be limited to lenders holding mortgages in only single-family dwellings.

> This case thus raises the question of whether the "strip down" protections which Congress denied to owners residing in single-family homes, in order to encourage the flow of residential mortgage funds, are nonetheless available to owner occupants of multi-family housing. We hold that congress intends exactly such different results and that the anti-modification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one unit is the debtor's principal residence and the security interest extends to the other income-producing units. (Footnote omitted).

*Lomas Mortgage,* 82 F.3d at 1–2. *See also, Ford Consumer Finance Company, Inc. v. Maddaloni (In re Maddaloni),* 225 B.R. 277 (D.Conn.1998).

The First Circuit's decision to limit the home mortgage exception to only lenders with mortgages in a single family dwelling is reasonable. It also makes the administration of the home mortgage exception more certain. Nonetheless, Countrywide argues that *Lomas Mortgage* is wrong be-cause its interpretation of the home mortgage exception requires the addition of either "only" or "solely" to the phrase "real property that the debtor's principal residence." Countrywide's 8/6/04 Brief, at p. 8. However, Countrywide ignores the fact that "only" already is in Section 1322(b)(2).

> (2) modify the rights of holders of, secured claims, **other than a claim secured ONLY by a security interest in real property that is the debtor's principal residence,** or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2) (Emphasis added).

Although the First Circuit in *Lomas Mortgage* acknowledged that "only" as used in Section 1332(b)(2) is ambiguous, it resolved the ambiguity in favor of the more restrictive definition it ultimately adopted. Within this definition falls the vast majority of the types of loans for which home mortgage capital is sought. Granted, some additional lenders, such as the lender in *Lomas Mortgage,* would benefit from a definition that included duplexes and triplexes. However, with that reasoning, even more lenders would benefit from a definition that included 4–unit apartments and even more would benefit from a definition that included 100–unit apartments.

The point made in *Lomas Mortgage,* though, is that some line must be drawn so that the lenders generally can make rational decisions when underwriting loans to individual borrowers. The outcome in *Lomas Mortgage* may not have seemed fair to that particular mortgage lender. However, the outcome is at least one that a lender could have anticipated and adjusted for accordingly. Moreover, *Lomas Mortgage* gives all prospective lenders the certainty that is so important to the effective operation of markets. While the definition

chosen by *Lomas Mortgage* may not accomplish the equitable perfection sought by those courts that champion a case-by-case or totality of the circumstances approach, the exclusion of a few lenders from Section 1322(b)(2)'s home mortgage exception seems a small price to pay for the certainty afforded by a more precise definition.

Had Congress given more direction as to what it meant by "real property that is the debtor's principal residence" or had Congress emphasized equity over market concerns in rationalizing the inclusion of the home mortgage exception in Section 1322(b)(2), then I would be less inclined to favor the First Circuit's approach in *Lomas Mortgage*. However, its solution is both sound and practical. Moreover, as the First Circuit itself observed "[i]f we are wrong as to what Congress intended, legislation can provide a correction." *Id.* at 7.

The instant case is distinguished from *Lomas Mortgage* because the two dwelling units in this instance are at least semi-detached, whereas the three dwelling units in *Lomas Mortgage* shared common walls and a single roof. However, the distinction is insignificant. Therefore, I see no reason for deviating from the course already set by the First Circuit towards establishing what is meant by "real property that is the debtor's principal residence."

▮▮▮ I instead elaborate upon the *Lomas Mortgage* definition to further narrow the home mortgage exception to those instances where the mortgage includes only a single family dwelling unit used by the debtor as his principal residence and structures that complement that dwelling unit (*e.g.*, a detached garage or a storage shed). This definition is consistent with my May 27 ruling concerning Countrywide's objection to the Bulsons' February 20 amended plan. Put simply, the Bulsons were permitted under their plan to modify Countrywide's rights as a lender and mortgagee under Section 1322(b)(2), because there was a second dwelling unit on the Holton property. As such, Countrywide's claim against Mr. Bulson was not secured "only by a security interest in real property that is the debtor's principal residence."

It makes no difference whether the Bulsons collected rent from Mr. Bulson's mother or whether Mr. Bulson's mother or some other tenant actually occupied the second unit. It is sufficient that the second unit existed at the time Republic Bank, Countrywide's predecessor in interest, entered into its lending arrangement with Mr. Bulson in March 2003.[14] Republic Bank would have been placed on notice by the mere existence of the second unit that the Bulsons could use the premises other than as their own personal residence. Therefore, Republic Bank would have also been on notice that its rights as a creditor could be modified if the Bulsons later sought Chapter 13 relief. Indeed, it is distinctly possible that Republic Bank took this factor into account as it decided upon the terms of its loan to the Bulsons. If it did not, it should have.

---

**14.** The record does not definitively establish that the second dwelling unit existed when Republic Bank and Mr. Bulson entered into their agreement in March 2003. However, a reasonable inference can be made to this effect given the fact that the loan was recently made and that there was no indication that the Bulsons had later engaged in construction activity. Indeed, documents that Countrywide proposes I now consider corroborate the inference that the second dwelling unit was constructed some time before March 2003. Moreover, Countrywide's attorney interrupted my May 27, 2004 bench opinion to express her own belief that "both of the separate dwellings" were already on the Holton property when the mortgage was granted in 2003. 5/27/04 Transcript, p. 32.

I further elaborate upon *Lomas Mortgage's* definition by giving it a temporal component as well. Countrywide argues that a debtor could easily sidestep the Section 1322(b)(2) home mortgage exception by adding a second living unit to the property on the eve of the commencement of his Chapter 13 proceeding. However, the definition I adopt refers to the status of the debtor's property when the mortgage loan is made. It is at that point in time that the underwriting decision is made and it is therefore at that point in time that the lender must know whether the loan it is making may be subject to modification in a Chapter 13 proceeding at some later date.[15]

In summary, I do not pretend that my effort to elaborate upon *Lomas Mortgage's* definition of the Section 1322(b)(2) home mortgage exception is perfect. There undoubtedly will be instances where it would be fairer under the specific circumstances to ignore the definition I have chosen and permit the lender to take advantage of the home mortgage exception. Indeed, there may be instances where the totality of the circumstances would warrant ignoring the definition and treating the lender as if it were not eligible for the home mortgage exception. However, legislation is seldom so well drafted that equity is guaranteed no matter what the circumstances in a particular case may be. In some instances, the courts can compensate for such inequities by considering those circumstances as it enforces the law. Unfortunately, this is not one of those instances. Congress' purpose in enacting the home mortgage exception requires definition to be given to its enactment and it is therefore definition that I give.

## C. Reconsideration of Confirmation Order Based Upon Countrywide's New Section 1325(a)(5) Objection.

Countrywide's total claim against Debtors is approximately $120,000.[16] Debtors confirmed plan, that being the February 20 amended plan, provides that this claim is to be bifurcated so that $107,000 is treated as a secured claim and the $13,000 balance is treated as an unsecured claim. The February 20 amended plan then provides that Countrywide is to receive $500 a month on account of its $107,000 secured claim for the life of Debtors' plan and then $600 per month thereafter.

Countrywide adamantly argued throughout the confirmation process that the Bulsons could not modify its rights as a secured creditor because its mortgage fell within the Section 1322(b)(2) exception. However, Countrywide never once com-

---

15. Countrywide's specific argument concerning the temporal aspect of the definition was that a debtor could easily avoid Section 1322(b)(2)'s exception for home mortgages by renting out a room in his home on the eve of the commencement of his Chapter 13 proceeding. Of course, that argument assumes that the expanded definition I have given to "real property that is the debtor's principal residence" excludes mortgages involving single family homes if one or more rooms of the home is rented. The assumption is not well founded. Countrywide's hypothetical is beyond the scope of this opinion. All that I decide here is that Countrywide's mortgage in the Holton property is not eligible for the Section 1322(b)(2) home mortgage exception because there is a second building on that property which is not a complementary outbuilding such as a detached garage or a storage shed.

16. Countrywide's February 20, 2004 proof of claim sets its pre-petition indebtedness at $120,609.33. However, Countrywide's proof of claim further states that this amount is only an estimate. As for the Bulsons, they indicated in their Schedules A and D that Countrywide's pre-petition indebtedness is $119,500.

plained during that process that the Bulsons' proposed modification of its rights was itself improper.[17] It is only now that Countrywide first argues that the Bulsons' February 20 amended plan could not be confirmed because their plan also did not comply with the confirmation standard set forth in Section 1325(a)(5)(B)(ii).

Section 1325(a)(5) protects secured creditors who, like Countrywide, are to have their rights modified by the debtor's plan pursuant to Section 1322(b)(2). It requires the debtor's plan to pay the creditor's secured claim, as modified, in full with interest within the life of the plan unless the creditor consents to different treatment.[18]

**17.** Indeed, both Countrywide and the Bulsons agreed that the only issue impeding confirmation of the February 20 amended plan was the Section 1325(a)(1)/1322(b)(2) issue.

THE COURT: ... Mr. Newman [Debtors' attorney], I want to reaffirm your representation this morning that it is the debtors' intention to withdraw the second amendment to their plan and to proceed with confirmation today based upon the first amendment previously filed in connection with their plan. Is that correct.

MR. NEWMAN: That's still correct, your Honor.

THE COURT: Thank you. And, Mr. Johnson, my understanding is that the trustee is withdrawing his objection to the plan as represented by the original plan as first amended and is prepared to recommend confirmation subject to my resolution of the objection of Countrywide; is that correct?

MR. JOHNSON: That's correct, your Honor.

THE COURT: Now, Ms. Weddell, you are appearing on behalf of Countrywide Home ·Loans, Inc. And my understanding is, is that your client stands on its objection to confirmation of ·the plan as first amended; is that correct?

MS. WEDDELL: Our objection was filed on the original Chapter 13 plan, your Honor.

\* \* \* \* \* \*

THE COURT: Okay. And, Ms. Weddell, the Countrywide's objection is that the plan may not be confirmed because it modifies

(a) Except as provided in subsection (b), the court shall confirm a plan if—

\* \* \* \* \* \*

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

the treatment of Countrywide under the original terms of the lending arrangement and that contradicts Section 1322(b) and specifically the exception of 1322(b); is that correct?

MS. WEDDELL: Yes, your Honor.

THE COURT: And that is your client's objection?

MS. WEDDELL: Yes, your Honor.

THE COURT: Okay. So the issue for confirmation is simply whether the secured claim in this instance is within or without the exception of Section 1322(b)(2). If I conclude today that it is within the exempt— that exception, then the plan may not be confirmed because, Mr. Newman, it does modify the treatment of— it modifies the original terms of the lending arrangement between debtor and Countrywide. Conversely, if I conclude that the exception does not apply, then the plan may be confirmed. That is the issue that I'm deciding; correct, Mr. Newman?

MR. NEWMAN: Yes, your Honor.

THE COURT: And, Ms. Weddell?

MS. WEDDELL: Yes, your Honor.

THE COURT: Okay. Very good.

5/27/04 Transcript, pp. 28–30.

**18.** *See, In re Stivender*, 301 B.R. 498, 500 (Bankr.S.D.Ohio 2003), *In re Hussain*, 250 B.R. 502, 507 (Bankr.D.N.J.2000). In contrast, a family farmer's Chapter 12 plan may extend payment of a secured claim beyond the general five year plan term. 11 U.S.C. § 1222(b)(9).

(C) the debtor surrenders the property securing such claim to such holder, and

11 U.S.C. § 1325(a)(5).

The maximum length of a Chapter 13 plan is five years. 11 U.S.C. § 1322(d).

The Bulsons' February 20 amended plan clearly does not meet the Section 1325(a)(5)(B) standard. Total payments to be made to Countrywide on account of its secured claim over the five years of their plan[19] total $30,000. This amount falls well short of the $107,000 the Bulsons themselves agree is to be Countrywide's allowed secured claim under their plan. I clearly could not and would not have confirmed Debtors' February 20 amended plan had either Countrywide or the Chapter 13 trustee raised the Section 1325(a)(5)(B) issue at the May 27, 2004 confirmation hearing or had I identified the issue myself. Therefore, the only issue is whether it is inappropriate to amend the confirmation order once entered to prevent Debtors from benefitting from what is unquestionably an unlawful plan under Section 1325(a).

Countrywide's motion is brought pursuant to Rule 9023(e). That rule permits a party to seek the amendment or alteration of an order or judgment within ten days of its entry. Rule 9023(e) complements Rule 9024 just as Fed.R.Civ.P. 59(e) complements Fed.R.Civ.P. 60.

However, Section 1330(a) of the Bankruptcy Code also addresses the modification of Chapter 13 confirmation orders. That section permits a party in interest to revoke a confirmation order only if a motion is filed within 180 days of the confirmation order's entry and then only if the confirmation order "was procured by fraud." Courts have held that Section 1330(a) overrides Rule 9024(b) and, therefore, a confirmation order, once entered, may not be set aside for one of the other reasons permitted by Rule 9024(b). *Branchburg Plaza Associates, L.P. v. Fesq (In re Fesq)*, 153 F.3d 113, 120 (3rd Cir. 1998); *Mason v. Young (In re Young)*, 237 B.R. 791, 800–03 (10th Cir.BAP1999). *See also, In re Hudson*, 260 B.R. 421, 443–4 (Bankr.W.D.Mich.2001) (holding that Section 1330(a) "trumps" Rule 9024 but that constitutional requirements of due process "trump" Section 1330(a)).

None of the cited opinions specifically address the applicability of Section 1330(a) to Rule 9023(e). Nonetheless, the reasoning offered in those decisions is compelling. Therefore, I conclude that Section 1330(a) also limits a Rule 9023(e) motion to set aside a Chapter 13 confirmation order to only those instances where the order has been procured by fraud.[20]

---

**19.** The actual length of Debtors' plan cannot be determined from the February 20 amended plan itself. Therefore, for purposes of this opinion, I have simply assumed that the length of Debtors' plan is the maximum five years permitted by Section 1322(d).

**20.** The only relief requested in Countrywide's motion is for the confirmation order to be set aside. Nonetheless, I have considered whether the confirmation order could be amended as opposed to revoked outright. *See, e.g., Midkiff v. Stewart (In re Midkiff)*, 342 F.3d 1194 (10th Cir.2003) (holding that a Chapter 13 discharge order to be "vacated" (as opposed to revoked) because of a mistake notwithstanding Section 1328(e)'s similar limitation on revocations to only orders obtained through fraud). Such an amendment might be to exclude Countrywide from the plan because of the Bulsons' unlawful treatment of its claim but to otherwise leave the confirmation order unchanged.

However, I do not have the authority to permit such an amendment. It is the debtor, not the court, who controls the terms of a plan. 11 U.S.C. §§ 1321 and 1322. The court, in confirming that plan, simply determines whether its provisions conform with the standards set forth in Section 1325. Consequently, if the court later determines that

 Countrywide's Rule 9023(e) motion cannot substitute as a request to revoke the confirmation order pursuant to Section 1330(a). Rule 7001(5) is quite clear that an adversary proceeding is required to procure such relief. Therefore, Countrywide's motion is procedurally defective even if it were to be recharacterized as a request for relief under Section 1330(a).

### D. *Revocation of Confirmation Order Because of Fraud on the Court.*

Section 105(a) empowers the court itself to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title [the Bankruptcy Code]." That section also recognizes that references in the Bankruptcy Code to parties in interest having to request relief and the like [21] do not "preclude the court from, sua sponte, taking an action … appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). I now invoke this authority under Section 105(a) to address whether the order confirming the Bulsons' plan should be revoked under Section 1330(a) because it was procured by fraud.[22]

The case law is relatively sparse as to what must be established in order to find fraud under Section 1330(a). The Fifth Circuit, in *Nikoloutsos v. Nikoloutsos (In re Nikoloutsos),* 199 F.3d 233, 238 (5th Cir.2000), identified five elements.

> Under 11 U.S.C. § 1330(a), to prove that a debtor obtained a confirmation of his plan by fraud, the creditor must prove: (1) that the debtor made a representation regarding his compliance with

those confirmation standards were in fact not met, the only relief the court can offer is the revocation of the confirmation order. Whether the deficiency itself can be corrected is left to the debtor to address through an amended plan if and when the confirmation order is revoked.

**21.** *e.g.,* "On request of a party in interest … the court may revoke …." 11 U.S.C. § 1330(a).

**22.** Although Fed.R.Bankr.P. 7001(5) requires a party in interest to seek revocation of a Chapter 13 confirmation order through an adversary proceeding, the court is not similarly constrained. First, my authority to proceed sua sponte derives from Section 105(a), not Section 1330(a), and there is no restriction within that section as to how the court is to exercise the powers granted therein. Therefore, the procedural requirements of Fed.R.Bankr.P. 7001(5) are "trumped" by Section 105(a). *In re Hudson,* 260 B.R. at 443–44. Second, from a practical point of view, requiring the court itself to commence an adversary proceeding to revoke a debtor's confirmation order would be absurd and impractical. Service of a summons and complaint is the primary factor which distinguishes an adversary proceeding from motion practice. *In re Fuller,* 255 B.R. 300 (Bankr.

W.D.Mich.2000). However, a court does not perform its duties through the filing of complaints and the service of summonses. It acts through its orders.

In the instant case, I issued an order on March 18, 2005 that placed the Bulsons on notice that I was considering Countrywide's separate contention that their February 20 amended plan was unlawful because it violated Section 1325(a)(5). That order also gave the Bulsons the opportunity to brief not only this issue but also whether I had the authority even to set aside the confirmation order. The Bulsons' April 4, 2005 brief did not address either of these issues. Rather, it simply reiterated the Bulsons' argument as to why my Section 1322(b)(2) ruling should not be set aside.

I interpret the Bulsons' failure to brief the Section 1325(a)(5) issues identified in my March 18, 2005 order as a tacit concession that they can offer no valid response. That is, the Bulsons admit that their treatment of Countrywide under their February 20 amended plan is unlawful because of Section 1325(a)(5) and that I do have the authority to set aside the order confirming that plan because of that unlawful provision. Consequently, no further process is due the Bulsons.

§ 1330(a) which was materially false; (2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth; (3) that the representation was made to induce the court to rely upon it; (4) that the court did rely upon it; and (5) that as a consequence of such reliance, the court entered confirmation.

*In re Nikoloutsos*, at 238.

The Fifth Circuit adopted this test verbatim from *Stamford Municipal Employees' Credit Union v. Edwards (In re Edwards)*, 67 B.R. 1008, 1009–10 (Bankr. D.Conn.1986). Other courts have also relied upon the *Edwards* test when considering motions to revoke Chapter 13 confirmation orders. *See, e.g., U.S. v. Moseley (In re Moseley)*, 74 B.R. 791, 803 (Bankr. C.D.Cal.1987), *rev'd on other grounds*, 101 B.R. 608 (9th Cir.BAP1989); *In re Hicks*, 79 B.R. 45, 48–49 (Bankr.N.D.Ala.1987).

The court in *Edwards* observed that neither Section 1330(a) nor the legislative history supporting that section offered any insight as to what would constitute fraud for purposes of that section. Consequently, the court relied upon the case law interpreting other sections of the Bankruptcy Code where the term "fraud" is used. Specifically, the court referred to a similar revocation section for confirmed Chapter 11 plans, 11 U.S.C. § 1144, and the non-dischargeability provisions for fraud, 11 U.S.C. § 523(a)(2), to create the five element test it did.

I question the *Edwards* test. The Seventh Circuit, in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000) has held that the term fraud as used in Section 523(a)(2)(A) should not be narrowly construed.

No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453–54 (Okla.1952).

*Id.* at 893.

The test the *Edwards* court established is for the most part the test used by courts when a creditor alleges under Section 523(a)(2)(A) that a debt should be declared non-dischargeable because the debtor had defrauded the creditor through a misrepresentation. *Edwards*, 67 B.R. at 1009–10. *See, also, Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986). Reliance, of course, is a necessary element when fraud is alleged in that context. However, it does not follow that reliance is also an element in the myriad of other contexts in which "surprise, trick, cunning, dissembling" and other deceptive means is used by a party to defraud another.

Moreover, I conclude that the *Edwards* test is inapplicable in this instance because the fraud involved is not fraud upon Countrywide, but upon the court itself. Fed. R.Bankr.P. 9024 recognizes two types of fraud with respect to the revocation of judgments and orders entered by the bankruptcy court. One type is when the fraud has been perpetrated against the other party. An example of this type of fraud is when a party has consented to the dismissal of an action based upon the other parties misrepresentation of a material fact. The other type is when the fraud has been perpetrated upon the court itself. It is axiomatic that a court should not enforce

an order if the court's deliberation with respect to that order was corrupted by a party's misconduct.

■ One can certainly debate the scope of Section 1330(a)'s fraud requirement as it relates to parties in interest. However, I am well satisfied that "fraud," as that term is used in Section 1330(a), encompasses those situations where there has been a fraud upon the court itself.

Fraud upon the court has been defined by the Sixth Circuit as conduct:

(1) On the part of an officer of the court;

(2) That is directed to the "judicial machinery" itself;

(3) That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth;

(4) That is a positive averment or is concealment when one is under a duty to disclose;

(5) That deceives the court.

*Workman v. Bell*, 245 F.3d 849, 852 (6th Cir.2001), citing *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir.1993).

■ In the instant case, the Bulsons' attorney, Paul B. Newman, is an officer of the court. *In re Mosher*, 25 F.3d 397, 399–400 (6th Cir.1994); *see also*, MICH. COMP. LAWS § 600.901. Mr. Newman also prepared, signed, and filed the Bulsons' February 20 amended plan. He submitted the February 20 amended plan with the purpose of having it confirmed by this court pursuant to Section 1325. In connection with that submission, he affirmatively represented to the court that the February 20 amended plan was being submitted for a proper purpose and that the legal contentions within them were warranted by existing laws or a non-frivolous argument for the modification of that law. Fed.R.Bankr.P. 9011(b)(1) and (2).

However, Mr. Newman's representations were clearly false because provisions of the February 20 amended plan that Mr. Newman drafted and submitted did not comport with the confirmation standards of Section 1325. Specifically, Section 1325(a)(5) prohibited the Bulsons' proposed repayment of Countrywide's modified secured claim over a period longer than the maximum five years permitted by Section 1322(d).

■ Mr. Newman's misrepresentation as to the lawfulness of the Bulsons' plan occurred both when he filed the February 20 amend plan on the Bulsons' behalf and then again when he advocated confirmation of the February 20 amended plan at the May 27, 2004 hearing. Fed. R.Bankr.P. 9011(b). A plan does not confirm itself. The debtor, as the plan's proponent, has the burden of establishing that the plan meets all of the Section 1325(a) confirmation standards. *Tillman v. Lombard*, 156 B.R. 156, 158 (E.D.Va.1993); *In re Moore*, 319 B.R. 504, 515 (Bankr. S.D.Tex.2005).

■ It is difficult to imagine how Mr. Newman's misrepresentation concerning the lawfulness of the Bulsons' February 20 amended plan at the May 27, 2004 confirmation hearing could have been anything but intentional. This court's records indicate that Mr. Newman has represented debtors in numerous Chapter 13 proceeds over the course of many years. Indeed, Mr. Newman offers his expertise to his clients through a professional corporation known as "Aid to Debtors Bankruptcy Clinic, P.C." However, I need not find actual intent for Mr. Newman's misrepresentation to be considered to be a fraud upon the court. "Reckless disregard of the truth" will suffice, *Workman*, 245 F.3d at 852, and there is no question that Mr. Newman's representation concerning the lawfulness of the February 20 amended

plan that he was advocating on behalf of his clients was at the very least reckless.

 Finally, there is also no question that Mr. Newman deceived the court when he proceeded with the confirmation hearing on May 27, 2004. I recognize that the offending provision of the February 20 amended plan was in "plain sight" in the sense that Mr. Newman did not attempt to conceal it. In other words, the provision was not hidden away in some obscure corner of that plan. However, Mr. Newman's deception of the court lies not with the placement of the offending provision but rather with his representation as to its lawfulness. The court has an absolute right to rely upon an advocate's Rule 9011 representations concerning what is set forth in a Chapter 13 plan when that plan is submitted to the court for confirmation. It is not for the court to ferret out each and every offending provision from a Chapter 13 plan. Otherwise, the affirmative representations contemplated by Rule 9011(b) would be nothing more than a sham. Put simply, the deception of the court was complete when I confirmed a plan Mr. Newman submitted and then advocated as being lawful when in fact the plan violated the law.

Therefore, for the reasons I have given, I am revoking the order confirming the Bulsons' February 20 amended plan. Moreover, I am dismissing their Chapter 13 case. As already discussed, the Bulsons were on notice that their Chapter 13 case would be dismissed if they did not confirm a plan in conjunction with the May 27, 2004 hearing. The plan the Bulsons chose to have confirmed was the February 20 amended plan. Had either Countrywide or I discovered the unlawful treatment of Countrywide's claim under that plan at the May 27, 2004 hearing, I would have denied confirmation and dismissed their case.[23] I see no reason why the outcome should be different under these circumstances. To rule otherwise would reward the Bulsons for the fraud perpetrated by their attorney.

## CONCLUSION

For the reasons stated herein, Countrywide's motion is DENIED. However, the court itself: (a) revokes the order confirming the February 20 amended plan; and (b) dismisses the Bulsons' Chapter 13 proceeding. 11 U.S.C. §§ 105(a), 1307(c), and 1330(a).

The court will enter a separate order consistent with this opinion.

---

**23.** The outcome would have been the same had the Bulsons chosen to seek confirmation of their original November 17 plan instead of the February 20 amended plan since both plans proposed the same unlawful extension of Countrywide's secured claim.