In re Michael B. SMART, Elaine M. Smart, Debtors.

Bankruptcy No. 97–31153.

United States Bankruptcy Court, D. Connecticut.

Oct. 14, 1997.

George W. Derbyshire, Trumbull, CT, for Debtor–Movants.

Lawrence B. Pellegrino, Berchem, Moses & Devlin, P.C., Milford, CT, for Respondent.

## MEMORANDUM OF DECISION ON MOTION TO DETERMINE SECURED STATUS OF CLAIMS

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This matter presents an interesting question in the continuing wake of *Nobelman v. American Savings Bank (In re Nobelman)*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In *Nobelman*, the United States Supreme Court construed Section 1322(b)(2) of the Bankruptcy Code to preclude a Chapter 13 debtor from relying on Section 506(a) to "bifurcate" an undersecured homestead mortgage into secured and unsecured components, thereby reducing the extent of the creditor's lien to the fair market value of the debtor's principal residence. One of the questions not answered by *Nobelman* is whether bifurcation of a mortgage debt into secured and unsecured portions can be accomplished when the real property subject to such mortgage is not *presently* the principal residence of the debtor, but *was* the principal residence *at the time of the original mortgage transaction*. This Court construes Section 1322(b)(2) to prevent such mortgage modification under the circumstances of this case.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1) and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(B), (K), (L), (O).

### III. FACTUAL AND PROCEDURAL BACKGROUND

The Court finds the following facts from (1) its judicial notice of the files and records of this case, (2) the oral stipulation of the parties at hearing, and (3) the written "Stipulation" of the parties filed June 16, 1997.

On or about May 23, 1989, the Debtors purchased a single family residence in the City of New Haven, Connecticut, known as and numbered 333 Poplar Street (hereafter referred to as the "Property"). Financing for the Debtors' purchase of the Property was provided through a program of the Connecticut Housing Finance Authority (hereafter referred to as "CHFA"). Under that program, the Debtors became indebted through their execution of a "Growing Equity Mortgage Note" in favor of GMAC Mortgage Corp. of PA (hereafter referred to as "GMAC"), in the original principal amount of $87,500 (hereafter referred to as the "Mortgage Note"). The Mortgage Note was secured by a "Growing Equity Mortgage" dated May 23, 1989 (hereafter referred to as the "Mortgage"), which encumbered the Property in favor of GMAC. Also on May 23, 1989, the Mortgage Note and Mortgage were endorsed and/or assigned by GMAC to CHFA. Although CHFA is the legal holder of the Mortgage Note and Mortgage, GMAC continues to service the mortgage debt on behalf of CHFA. A proof of claim has been filed on behalf of CHFA in this bankruptcy case asserting a total claim under the Mortgage Note of $101,270.89.

CHFA does not contest the Debtors' fair market valuation of the Property at $18,000.00. It also concedes that a statutory sewer lien prior in right to the Mortgage secures a claim in the amount of $1,157.31.

In order to obtain the financing evidenced by the Mortgage Note, the Debtors executed, *inter alia*, a "CHFA Uniform Mortgage Rider" (hereafter referred to as the "Mortgage Rider"). Under the terms of the Mortgage Rider, the Debtors "covenant[ed] and agree[d] that ... [CHFA] may declare all

sums secured by the Mortgage to be immediately due and payable upon the occurrence of any of the following", *inter alia:* (1) the Property is sold or transferred without CHFA's prior written consent, or (2) the Debtors do not make the Property their principal residence within sixty (60) days of the closing, and continue to occupy the Property as their principal residence "throughout the term of the Mortgage".

Nearly six and one-half years later—on or about January 28, 1996—Debtor Michael Smart purchased additional real property in the City of New Haven, known as and numbered 46 William Street (hereafter referred to as the "William Street Property"). The Debtors then relocated to the William Street Property on or about April 1, 1996. The Debtors did not advise GMAC or CHFA that they were ceasing to occupy the Property as their principal residence, nor did GMAC or CHFA consent to the Debtors' vacating the Property as their principal residence.

In May of 1996, the Debtors began to lease the Property to Andrew Grist and Alberto Sanchez, neither of whom is any relation to the Debtors. These individuals continue to occupy the Property pursuant to an oral month-to-month lease. The Debtors did not advise GMAC or CHFA that they were leasing the Property to third parties, nor did GMAC or CHFA consent to the Debtors' leasing of the Property.

On or about August 1, 1996, the Debtors changed their drivers licenses to reflect the William Street Property as their residence. The Debtors also changed their voter registration in August of 1996 to reflect the William Street Property as their residence. Schedule E to the Debtors' 1996 joint federal income tax return (Form 1040) indicates that both the Property and the William Street Property were "Rental Real Estate" during Tax Year 1996.

After unsuccessful attempts to negotiate repayment plans with their creditors, the Debtors commenced the present Chapter 13 bankruptcy case on March 21, 1997 (hereafter referred to as the "Petition Date"), through the filing of a joint voluntary petition. The instant contested matter was commenced through the Debtors' filing of a motion denominated by them a "Motion to Determine the Value of Claim Secured by Lien and Objection to Lien Exceeding Said Value Pursuant to 11 U.S.C. 506(a) and (d)" (Doc. I.D. No. 7) (hereafter referred to as the "Bifurcation Motion"). The Bifurcation Motion prays, *inter alia,* that this Court find that the Mortgage "is secured to the extent of $16,842.69 and the balance of said lien is undersecured." A proposed order submitted with the Bifurcation Motion indicates that the Debtors also desire that this Court declare (1) that the "undersecured" portion of the mortgage debt be treated as an unsecured claim and (2) that the Mortgage lien is "void and discharged" to the extent that it secures indebtedness in excess of $16,842.69.

In support of their prayer for relief, the Debtors argue that the protection from mortgage modification afforded by Section 1322(b)(2) only extends to creditors with liens on property which is a debtor's principal residence *at the time of the commencement of the bankruptcy case.* They glean this position from what they believe to be the "plain language" of Section 1322(b)(2), eschewing in the process any recourse to the legislative history of that statute.

As noted above, CHFA does not contest the Debtor's claim bifurcation calculus. Rather, its opposition to the Bifurcation Motion is founded upon a belief that the mortgage modification contemplated by the Debtors is "inconsistent with the legislative history and purpose of Section 1322(b)(2)", namely the encouragement of affordable residential lending.

## IV. DISCUSSION

In *Nobelman* the procedural vehicle giving rise to the Supreme Court's construction of Sections 506 and 1322 was an objection to the confirmation of a Chapter 13 plan which proposed a bifurcation of the creditor-objector's claim. In contrast to the procedural posture of *Nobelman,* confirmation of the Debtors' Chapter 13 Plan is not presently before this Court.[1] Rather, this matter comes before

---

1. The Court notes, however, that the Debtors' proposed First Amended Plan (Doc. I.D. No. 27),

the Court solely upon a motion made pursuant to Section 506 of the Bankruptcy Code, and arguably it can be determined solely by reference to the provisions of that Section without considering Section 1322.

## A. Application of Section 506.

Section 506 provides in relevant part that:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim.

\*   \*   \*   \*   \*   \*

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void.

11 U.S.C. § 506 (1997).

Given the parties' factual stipulations, determination of the secured status of CHFA's claim under Section 506(a) is a relatively straightforward exercise. The amount of the "allowed claim" of CHFA is $101,270.89.[2] The value of the "estate's interest" in the Property—*i.e.* the fair market value of the Property—is $18,000. The value of the "creditor's [CHFA's] interest in the estate's interest" in the Property is $16,842.69, calculated by subtracting from the fair market value of the Property the value of the lien which is prior in right to CHFA's mortgage (i.e. $18,000.00 minus $1,157.31). Accordingly, under the calculus of Section 506(a), CHFA would have a *secured* claim in the amount of $16,842.69, and an *unsecured* claim for the balance of its total claim.

The application of subsection (d) of Section 506 is also relatively straightforward. That subsection states plainly that to the extent a lien, such as the Mortgage here, secures a

claim against the Debtors that is not an allowed secured claim, such lien is void. Accordingly, because under Section 506(a) CHFA's secured claim extends to only $16,842.69 of its total claim, its Mortgage would be voidable under Section 506(d) to the extent of the balance of said claim.

■ Given the foregoing analysis, the Bifurcation Motion could be determined in the Debtors' favor if analyzed solely with reference to Section 506. However, since the ultimate, and only legitimate, goal of relief under Chapter 13 is the confirmation of a Chapter 13 Plan, the granting of relief under Section 506 alone might well prove a pyrrhic victory for the Debtors if the claim bifurcation they achieve thereunder ultimately runs afoul of requirements for the confirmation of a Chapter 13 Plan. The parties to this matter recognize that reality, and have focused their arguments on the requirements of Section 1322(b)(2). The Court agrees with this focus, since claim bifurcation and avoidance of liens in the absence of plan confirmation is inconsistent with the relief afforded by Chapter 13, and might be indicative of an abusive debtor agenda.[3] Hence, this Court will assess the merits of the Bifurcation Motion under the standards of Section 1322 as well as Section 506.

## B. Application of Section 1322.

Section 1322 of the Bankruptcy Code— "Contents of plan"—provides in relevant part as follows:

\*   \*   \*   \*   \*   \*

(b) Subject to subsections (a) and (c) of this section, the plan may—

\*   \*   \*   \*   \*   \*

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real prop-

---

filed July 2, 1997, deems as unsecured the portion of the claim of CHFA that exceeds $16,842.69.

**2.** CHFA's claim is "deemed allowed" in this amount unless and until a party in interest objects. *See* 11 U.S.C. § 502(a). To date, no objection has been interposed to CHFA's claim.

**3.** For instance, a debtor might seek to bifurcate liens in Chapter 13, then convert his case to one under Chapter 7 in an attempt to circumvent the prohibition on Chapter 7 lien avoidance under Section 506(d) as announced in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

erty that is the debtor's principal residence....

11 U.S.C. § 1322 (1997).

The United States Supreme Court has now clarified that with respect to a creditor holding a claim secured by a debtor's principal residence, Section 1322(b)(2) prevents modification of the *entire* claim, not only the *secured* portion thereof. *Nobelman*, 508 U.S. at 328–32, 113 S.Ct. at 2109–12. The present parties agree that Section 1322(b)(2), as construed by the *Nobelman* Court, would prevent the claim bifurcation sought in this matter if the Property is the Debtors' "principal residence" within the meaning of that section. They also agree that as a matter of *fact* the Property is not presently, nor was it on the Petition Date, the Debtors' principal residence, but that it *was* the Debtors' principal residence at the time of the subject mortgage loan transaction. This state of affairs suggests a legal question not yet answered by any Court with precedential authority over this Court, namely: for the purpose of Section 1322(b)(2), what is the appropriate reference date for determining the "principal residence" status of a given property?

■ This question can only be answered through a process of statutory construction. Simply and generally stated, that process requires that this Court look first to the statutory language itself, and then to the legislative history if the statutory language is unclear. *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). The Supreme Court has also acknowledged that in "rare cases" the literal application of a statute may produce a result "demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such cases, the intention of the drafters, rather than the strict language, should control. *Id.*

At least two other bankruptcy courts have approached the question at hand and found no lack of legislative clarity in the temporal aspect of the clause, "a claim secured only by a security interest in real property that is the debtor's principal residence". *E.g., In re Wetherbee,* 164 B.R. 212 (Bankr.D.N.H.1994); *accord, In re Lebrun,* 185 B.R. 665 (Bankr. D.Mass.1995). The court in Wetherbee concluded that the clause unambiguously references a property's status as a principal residence *on the petition date. Wetherbee,* 164 B.R. at 215. Accordingly, that court gave little, if any, constructive weight to the congressional purposes behind Section 1322(b)(2). *Id.* at 215–16.

The *Wetherbee* court implicitly concluded that the phrase, *"real property that is the debtor's principal residence,"* modifies its remotely antecedent term *"claim". Id.* at 215. The court then observed that under the Bankruptcy Code the term "claim" has a temporal reference point of the petition date. *Id.*[4] Given these determinations, the *Wetherbee* court logically concluded that the modifier clause should assume the temporal character of its presumed antecedent.

■ This Court respectfully disagrees with the conclusion and analysis of the *Wetherbee* and *Lebrun* courts. Rather than focusing on the *remotely* antecedent term, *"claim",* this Court believes that the critical phrase, *"real property that is the debtor's principal residence",* is intended to modify its more immediate antecedent term, *"security interest".* With that focus, this Court believes that the subject clause is susceptible of at least two credible interpretations. First, it can be read, as the Debtors suggest, to refer to a home's status as a principal residence at the *present time* (or the petition date). Second, it can be read, as urged by CHFA, to refer to the home's status *at the time that the security interest was created.* To avoid this ambiguity, congressional drafters needed to employ more modifying words. For instance, if Congress had intended the Debtors' suggested construction, it might have drafted the clause as follows: "... a claim secured only by a security interest in real property that is *at the time of the filing of the petition* the debtor's principal residence...."; or alternatively, if the congres-

---

4. *See* 11 U.S.C. § 502(b)("... court ... shall determine the amount of such claim ... as of the date of the filing of the petition....").

sional purpose was consistent with CHFA's contention, the drafters might have drawn the clause as follows: "... a claim secured only by a security interest in real property that is *at that time* the debtor's principal residence...." By failing to be more explicit, Congress left an ambiguity in the statute which compels recourse to its legislative history.

. As Justice Stevens observed in his concurrence in *Nobelman,* the legislative history of Section 1322(b)(2) indicates that favorable statutory treatment of homestead mortgagees was intended to encourage and sustain a flow of affordable capital into the home lending market. *Nobelman,* 508 U.S. at 332, 113 S.Ct. at 2111–12; *see generally Grubbs v. Houston First American Savings Association,* 730 F.2d 236, 245–56 (5th Cir.1984). Reading Section 1322(b)(2) to refer to a property's status at the time of the creation of the subject security interest is consistent with, and wholly supportive of, Congress' "flow of capital" purpose. Under such a construction, a lender supplying financing on an owner-occupied single-family home would be assured that its rights under the subject mortgage could not be modified through bifurcation in a future Chapter 13 case involving its borrowers. By contrast, a construction which makes the petition date (or motion decision date) the status determination date injects additional creditor risk into the mortgage loan transaction by creating the opportunity for debtors to manipulate their place of principal residence after completion of the mortgage transaction and prior to (or during) their Chapter 13 case, thereby "bootstrapping" modification of a mortgage that was taken in reliance upon the security serving as the principal residence.[5]

In construing Section 1322(b)(2) so as to give maximum effect to the intentions of Congress, this Court allies itself philosophically with those Courts which approach post-*Nobelman* modification issues from the perspective of the circumstances existing at the time of the subject credit transaction, not the serendipitous or manipulated facts existing on the date of the filing of the petition. *See. e.g., In re Brunson,* 201 B.R. 351 (Bankr. W.D.N.Y.1996).[6] This approach animates the statute in the way that Congress intended, and thus honors the ultimate goal of statutory construction.[7]

Given the nature of the Court's disposition of this matter, it is unnecessary to consider CHFA's argument that the Debtors' Mortgage Rider "covenants" and agreements respecting their occupancy of the Property as a principal residence estop them from claiming, and/or prevent this Court from finding, that the Property is no longer the Debtors' principal residence.

## V. CONCLUSION

For the foregoing reasons, the Debtors' Bifurcation Motion (Doc. I.D. No. 7) shall be DENIED by separate Order.

---

**5.** In the present case, the Court does not find that the Debtors have pursued a course of conduct with the intention of circumventing the homestead mortgage insulation of Section 1322(b)(2).

**6.** The philosophy of this Court's ruling will discourage creditor manipulations as well. For instance. it would prevent a creditor from "bootstrapping" protection from bifurcation under Section 1322(b)(2) by manipulating its collateral package through e.g., the release of non-principal residence collateral.

**7.** Even if the plain language of Section 1322(b)(2) were not ambiguous in its temporal aspect, this Court would not alter its disposition of this matter, since it would conclude that the language of the statute presents one of the "rare" instances where the literal application of a statute may produce a result "demonstrably at odds with the intentions of its drafters." *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250.