Beth A. Buchanan, United States Bankruptcy Judge
U.S. Bank Trust, NA (the "Creditor") argues that the proposed cramdown of the Creditor's secured claim by Debtors Amy and James Lister ("Debtors") in their chapter 13 plan [Docket Number 17] is prohibited by the anti-modification provision of 11 U.S.C. § 1322(b)(2). The Debtors maintain that the anti-modification provision does not apply because Creditor's claim is secured by real property that is not solely the Debtors' principal residence. For the reasons that follow, this Court finds that 11 U.S.C. § 1322(b)(2) precludes the modification of the Creditor's claim.
I. FINDINGS OF FACT
The parties stipulated [Docket Number 24] to the following facts:
1. Debtors own the real property located at and commonly referred to as 10038 State Route 775, Scottown, Ohio 45678 (the "Property").
2. Debtors have owned the Property since 1996.
3. The Property consists of two adjacent parcels of real estate that are both pledged as collateral through a consensual mortgage for the debt owed to Creditor. The mortgage in question was executed on May 16, 2005 and was recorded with the Lawrence County Recorder's office on May 26, 2005. The mortgage fully matures on May 16, 2025.
4. The Debtors have owned and operated a home childcare on the premises for the past twenty-one years. This encompasses the entirety of the time that Creditor has held a mortgage against the Property.
5. Debtors receive monthly rent in the amount of approximately $600.00 for the rental of a separate structure that exists on the Property. The separate structure serves as a residence for a third-party.
*590 Debtors began the rental of this separate structure in October of 2014.
6. Debtors and Creditor agree that the information presented in the stipulations is submitted in lieu of testimony of the Debtors and such information is accepted as truthful and accurate. Creditor waives its rights to cross examination of the Debtors as witnesses.
7. Debtors obtained an appraisal of the entirety of the Property on April 25, 2017, with such appraisal being completed by licensed appraiser Jeffrey Hunter. A copy of the appraisal has been filed with the Court as ECF No. 9 and shall be considered Joint Exhibit 1 (the "Appraisal"). This Appraisal shall be admitted as evidence.[1]
The parties further stipulated [Docket Number 43] to the admission of the following additional exhibits, which were attached to the parties' respective briefs:
a. Debtors' Exhibits
i. Exhibit A - Deed
ii. Exhibit B - Mortgage
iii. Exhibit C - Lawrence County Auditor Property Cards
b. Creditor's Exhibits
i. Exhibit A - Lawrence County Auditor Property Cards
ii. Exhibit B - Debtors' 2016 Bankruptcy Petition
iii. Exhibit C - Debtors' 2016 Bankruptcy Docket
iv. Exhibit D - Foreclosure Complaint
v. Exhibit E - Answer to Foreclosure Complaint
vi. Exhibit F - Debtors' Notice of Filing Real Estate Appraisal
vii. Exhibit G - Creditor's Proof of Claim
II. ANALYSIS
Jurisdiction over this matter is vested in this Court by virtue of 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).
Section 1322(b)(2)[2] provides that a chapter 13 "plan may ... modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence [.]" 11 U.S.C. § 1322(b)(2) (emphasis added). This is known as the anti-modification provision or exception.
The two threshold legal issues before this Court are: (1) whether the anti-modification provision of § 1322(b)(2) applies to a security interest in real property that is the debtor's principal residence, if that property also hosts commercial activities-so called "mixed-use properties;" and, (2) the point in time for determining the debtor's "principal residence" status under § 1322(b)(2). Courts have grappled with these issues for the past twenty-plus years. Before weighing in, this Court will endeavor to summarize the divergent approaches.
A. Section 1322(b)(2) and "mixed-use property"
There are three differing approaches for determining the applicability of the antimodification *591 provision where the real property at issue serves as more than the debtor's principal residence. The vast majority of the cases in the mixed-use context involve real property that includes the debtor's principal residence as well as other income-producing rental property.
1. Approach # 1: Real property that is only the debtor's principal residence (the "Bright-Line Only Approach" )
The "majority" of courts have adopted a bright-line approach concluding that the antimodification provision does not apply unless the real property is only the debtor's principal residence. See e.g. , Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough) , 461 F.3d 406, 411 (3rd Cir. 2006) ; Lomas Mortg., Inc. v. Louis , 82 F.3d 1, 7 (1st Cir. 1996) ; In re Abrego , 506 B.R. 509, 515 (Bankr. N.D. Ill. 2014) (adopting and describing this approach as the majority approach); In re Bulson , 327 B.R. 830, 845 (Bankr. W.D. Mich. 2005). Two circuit courts adopt this approach, although for different reasons.
The Court of Appeals for the Third Circuit looked to the plain language of § 1322(b)(2) in concluding that the anti-modification provision does not extend to mixed-use property. In re Scarborough , 461 F.3d at 411.
By using the word "is" in the phrase "real property that is the debtor's principal residence," Congress equated the terms "real property" and "principal residence." Put differently, this use of "is" means that the real property that secures the mortgage must be only the debtor's principal residence in order for the anti-modification provision to apply. We thus agree with the reasoning of the Bankruptcy Court for the District of Connecticut when it noted that § 1322(b)(2)"protects claims secured only by a security interest in real property that is the debtor's principal residence, not real property that includes or contains the debtor's principal residence, and not real property on which the debtor resides ." In re Adebanjo , 165 B.R. 98, 104 (Bankr. D. Conn. 1994). A claim secured by real property that is, even in part, not the debtor's principal residence does not fall under the terms of § 1322(b)(2).
Id. (emphasis in original).
In contrast, the Court of Appeals for the First Circuit looked to the legislative history for reaching the conclusion that § 1322(b)(2) does not apply to mixed-use property. Lomas , 82 F.3d at 4.
[The creditor in Lomas argues] that the term "only" modifies "by a security interest in real property" and the term "that is the debtor's principal residence" further modifies "real property." [The creditor's] reading results in § 1322(b)(2) applying when (1) the security interest is only in real property (as opposed to personal, intangible or other non-real property) and (2) the real property is the "debtor's principal residence." Under this reading, there is no need that the real property be "only" the debtor's principal residence.
The [debtors], in contrast, argue (1) that "only" modifies the entire phrase "by a security interest in real property that is the debtor's principal residence"; and (2) that the word "is" requires complete and exclusive identity between "real property" and "principal residence."
[The creditor] criticizes the [debtors'] reading on the ground that the statutory language does not explicitly state that the real property must be "exclusively" the debtor's principal residence. The [debtors] criticize [the creditor's] reading on the ground that the statutory language does not explicitly state that *592 the real property must merely "contain" or "include" the principal residence.
Id. at 3-4. Concluding that the " 'plain meaning' approach to § 1322(b)(2) appears to us to be, in the end, inconclusive," id. at 4, the Lomas court conducted an extensive review of the legislative history behind § 1322(b)(2), ultimately concluding that the anti-modification provision does not reach multi-unit properties even where the debtor resides in one of the units. Id. at 7.
Critics of this approach note that it is too easy for the debtor to manipulate the outcome by converting their residential property to a commercial use on the eve of bankruptcy. See e.g. , In re Zaldivar , 441 B.R. 389, 390 (Bankr. S.D. Fla. 2011) ("The problem with this approach is that it would permit security interests to be modified on a debtor's primary residence when the debtor decides to rent out a garage apartment or convert a basement into a rentable apartment.").
2. Approach # 2: Real property that includes the debtor's principal residence (the "Bright-Line Includes Approach" )
An "emerging" minority of courts have adopted a similar bright-line test reaching the opposite conclusion of the courts adopting the Bright-Line Only Approach. The courts following this approach conclude that § 1322(b)(2) applies as long "as the debtor principally resides in some portion of the real property." In re Brooks , 550 B.R. 19, 24-25 (Bankr. W.D.N.Y. 2016) (emphasis in original); see also Wages v. J.P. Morgan Chase Bank, N.A. (In re Wages) , 508 B.R. 161, 167 (9th Cir. BAP 2014) (interpreting identical language under § 1123(b)(5) ); In re Hock , 571 B.R. 891, 898 (Bankr. S.D. Fla. 2017) (interpreting identical language under § 1123(b)(5) ); In re Macaluso , 254 B.R. 799, 800 (Bankr. W.D.N.Y. 2000).
Also looking to the plain language of the statute, these courts conclude that the placement of the word "only" in the phrase "secured only by a security interest in real property that is the debtor's principle residence," is an adverb modifying "secured"-not "the debtor's principle residence." In re Macaluso , 254 B.R. at 800. As such, these courts note that the plain language of § 1322(b)(2) -
does not protect from modification "claim[s] secured only by a security interest in real property that is exclusively the debtor's principal residence," or "claim[s] secured only by a security interest in real property that is the debtor's principal residence, unless the debtor also uses the property for significant commercial purposes." ... [T]here is nothing in the bankruptcy code indicating that, once a commercial use of a property becomes sufficiently "significant," that property ceases being the debtor's principal residence-either a property is a debtor's principal residence or it is not.
In re Wages , 508 B.R. at 167 (citations omitted) (emphasis in the original) (discussing the identical anti-modification provision under chapter 11).
Courts opposing this approach note that it can lead to absurd results when applied to loan transactions that are predominantly commercial in nature. See In re Zaldivar , 441 B.R. at 390 (noting that this approach "could conceivably be applied to, for example, a large factory in which the debtor maintains a small apartment as his or her residence."); Lomas , 82 F.3d at 6 (noting that "[i]t is unlikely Congress intended the antimodification provision to reach a 100-unit apartment complex simply because the debtor lives in one of the units.").
*593 3. Approach # 3: Case-By-Case Approach
Finally, a third line of cases rejects both bright-line approaches in favor of a case-by-case test focused on the intention of the parties. See e.g. , Litton Loan Servicing, LP v. Beamon , 298 B.R. 508, 512 (N.D.N.Y. 2003) ; In re Zaldivar , 441 B.R. at 390 ; In re Baker , 398 B.R. 198, 203 (Bankr. N.D. Ohio 2008) ; Brunson v. Wendover Funding, Inc. (In re Brunson) , 201 B.R. 351, 353 (Bankr. W.D.N.Y. 1996). These courts look to a totality of the circumstances, focusing on:
the predominant character of the transaction, and what the lender bargained to be within the scope of its lien. If the transaction was predominantly viewed by the parties as a loan transaction to provide the borrower with a residence, then the antimodification provision will apply. If, on the other hand, the transaction was viewed by the parties as predominantly a commercial loan transaction, then stripdown will be available.
In re Brunson , 201 B.R. at 354.
Courts that disfavor this approach note that it "introduces uncertainty and unpredictability to residential mortgage transactions because it requires courts to engage in subjective, hindsight analysis as to the intent of the parties." In re Scarborough , 461 F.3d at 414.
B. Point in time for determining "principal residence" status under § 1322(b)(2)
Similar to the divide regarding the applicability of § 1322(b)(2) to mixed-use property, there are three approaches to deciding the date used to determine whether real property is the debtor's principal residence for purposes of § 1322(b)(2).
1. Approach # 1: Petition Date (the "Petition Date Approach" )
Under the first line of cases, courts use the petition date to determine the debtor's principal residence status. See e.g. , In re Wages , 508 B.R. at 164 ; In re Brinkley , 505 B.R. 207, 213 (Bankr. E.D. Mich. 2013) ; In re Christopherson , 446 B.R. 831, 835 (Bankr. N.D. Ohio 2011) ; see also In re Berkland , 582 B.R. 571, 577 (Bankr. D. Mass. 2018) (interpreting identical language under § 1123(b)(5) ). This approach is viewed as the majority approach. See Benafel v. One West Bank, FSB (In re Benafel) , 461 B.R. 581, 589 (9th Cir. BAP 2011) ; In re Brinkley , 505 B.R. at 213.
Courts relying on this approach conclude that use of the petition date for determining the debtor's principal residence status is consistent with the language of § 1322(b)(2). Noting that:
[While] § 1322(b)(2) lacks explicit reference to its timing, the use of the word "claim" within the antimodification clause has been held to signify that the petition date should be the court's focus, since a "claim" in bankruptcy arises at the date of the filing of the petition. Also from a temporal standpoint, it has been observed that, looking to the circumstances as they exist at the time the petition is filed, conforms to the provision's use of the present tense "is"-with the antimodification clause providing "other than a claim secured only by a security interest in real property that is the debtor's principal residence."
In re Baker , 398 B.R. at 203 (quotation marks and citations omitted) (emphasis in original).
2. Approach # 2: Date the security interest is created (the "Loan Date Approach" )
A second line of cases uses the date when the creditor takes a security interest *594 in the real property as the relevant date for determining the debtor's principal residence status. See e.g. , In re Scarborough , 461 F.3d at 412 ; In re Abrego , 506 B.R. at 516 ; In re Bulson , 327 B.R. at 846.
Certain courts adopt this approach for the temporal component of § 1322(b)(2) as a way to bolster the use of the Bright-Line Only Approach. Id. "The reasoning behind this position is based largely on the concern that a contrary reading could lead to debtor manipulation; if a date other than the transaction date is utilized, debtors could seek to nullify the application of the anti-modification clause by modifying the use of their property immediately prior to filing." In re Kelly , 486 B.R. 882, 884-85 (Bankr. E.D. Mich. 2013).
One earlier court, however, turned to the legislative history of § 1322(b)(2) as support for its adoption of the date of the security interest approach. In re Smart , 214 B.R. 63, 67-68 (Bankr. D. Conn. 1997). The Smart court concluded that the phrase "real property that is the debtor's principal residence" modifies the antecedent term "security interest." Id. at 67. When read this way, the Smart court decided that § 1322(b)(2) was subject to at least two credible interpretations-it could be read as referring to the home's status as the debtor's principal residence at either the present time or at the time the security interest was created. Id. Concluding that the statute was ambiguous, the court looked to the legislative history of § 1322(b)(2) and decided that it was intended to "encourage and sustain a flow of affordable capital into the home lending market." Id. at 68. Fearing that debtors might manipulate their place of residence after the loan date and in anticipation of bankruptcy, the Smart court concluded that mortgage loan transaction date best served the Congressional purpose of the flow of capital to the mortgage lending market. Id.
3. Approach # 3: Hybrid Approach
The third approach taken by courts is a so-called "hybrid approach," which looks to "both the circumstances as they exist on the petition date as well as the underlying agreement." In re Baker , 398 B.R. at 203. This approach seeks to address the dual policy concerns "of creditors and debtors attempting to manipulate the application of the antimodification clause." Id.
C. This Court concludes that the real property that is the security interest must include the debtor's principal residence as of the petition date in order for the antimodification provision to apply.
As the Brooks court observed, much has been written over the past two decades regarding the meaning of § 1322(b)(2) such that "this Court can do little to add anything of value to the analysis." In re Brooks , 550 B.R. at 23. As such, this Court will take a position without further fanfare. Id. This Court adopts the view that the anti-modification provision applies if the security interest in the real property includes the debtor's principal residence (i.e. , the Bright-Line Includes Approach).[3] This Court also adopts the *595 view that the petition date is the appropriate date to determine the debtor's principal residence status (i.e. , the Petition Date Approach).
While this Court adopts the Bright-Line Includes Approach, this Court does so for different reasons than those expressed by other courts adopting this approach. Like the First Circuit in Lomas , this Court agrees that the meaning of § 1322(b)(2) is ambiguous where the real property at issue serves as more than the debtor's principal residence.
Although disagreement about a provision's meaning does not necessarily lead to the conclusion that it is ambiguous, the court concludes that § 1322(b)(2) is in fact ambiguous. While Wages argues that the statute does not state that it protects real property that is exclusively the debtor's principal residence, neither does it state that it protects real property that is partially the debtor's principal residence. The statute uses only the word "is" without any adverb, and that leads to an ambiguity.
In re Abrego , 506 B.R. at 514 (citation omitted) (emphasis in original); see also In re Wages , 508 B.R. at 168 (Kurtz, J., dissenting) ("That two appellate courts could, after careful analysis, come to such divergent conclusions on the plain meaning of the statute tends to support the notion that the statute actually is ambiguous.").
Where the statutory language is ambiguous, courts turn to the legislative history to interpret the meaning of a statute. Lomas , 82 F.3d at 4. The legislative history suggests that the "favorable treatment of residential mortgagees [under § 1322(b)(2) ] was intended to encourage the flow of capital into the home lending market." Nobelman v. American Sav. Bank , 508 U.S. 324, 332, 113 S.Ct. 2106, 2111-12, 124 L.Ed.2d 228 (1993) (Stevens, J., concurring). Indeed, each of the three approaches courts have taken in interpreting § 1322(b)(2) seeks to pay homage to this Congressional purpose. See In re Bulson , 327 B.R. at 842 ("[A] precise definition, even if arbitrary, is exactly what is needed to avoid disruption in the home mortgage capital market."); In re Wages , 508 B.R. at 167 ("The adoption of an objective rule eliminates line drawing and promotes certainty in the home mortgage lending market."); In re Brunson , 201 B.R. at 354 (concluding that a totality of factors approach "serves the Congressional intent of encouraging home mortgage lending, as illuminated by the Supreme Court in Nobelman .").
As the Lomas court observed, however, "the legislative history is silent on the scope of the incentive Congress wished to give home lenders." Lomas , 82 F.3d at 6. In defining the scope of the protections for the residential loan market, most courts strive to create an approach that is predictable *596 [4] and not subject to manipulation. To develop an approach to § 1322(b)(2) that best meets these objectives in the mixed-use property context, it is important to factor in the temporal component of § 1322(b)(2) as well.
Unfortunately, there is no perfect combination of the mixed-use property approaches and temporal component approaches that neatly satisfies all concerns. The multi-factor considerations in the case-by-case/hybrid approach mitigate against manipulation by debtors or creditors since the court can consider such factors when determining whether the anti-modification provision does or does not apply in a particular case. But this approach provides little in the way of predictability to either debtors or creditors since it will depend on which factors the court considers and what weight the court gives those factors.
This Court declines to adopt those approaches that use the loan date as the date to determine the debtor's principal residence status. This Court finds no ambiguity in the temporal component of § 1322(b)(2). Like the majority of courts that have addressed this issue, this Court agrees that the plain language of § 1322(b)(2)"points to the present and not the past." In re Berkland , 582 B.R. at 577. Scarborough is the most prominent case to have adopted the Loan Date Approach, "but in that case the court offered little discussion of the issue and no reason for disregarding the plain language of the statute." In re Berkland , 582 B.R. at 578.
The combination of the Bright-Line Only Approach and the Petition Date Approach lacks predictability at the loan inception date and is subject to manipulation by debtors. In re Bulson , 327 B.R. at 846 (debtor could manipulate the anti-modification exception by adding a second living unit to the property on the eve of bankruptcy); In re Scarborough , 461 F.3d at 412 (debtor could manipulate the anti-modification exception by taking on temporary tenants prior to filing bankruptcy).
The combination of the Bright-Line Includes Approach and the Petition Date Approach in contrast, has greater predictability in the mixed-use property context and is less susceptible to manipulation by a debtor. So long as the real property securing the creditor's claim includes the debtor's personal residence on the petition date, the claim will be subject to the anti-modification provision. In re Wages , 508 B.R. at 167 (observing that "either a property is a debtor's principal residence or it is not.").[5] While there is no perfect solution (absent clarification by the legislature), this Court finds that the combination of the Bright-Line Includes Approach and the Petition Date Approach best comports with the language and objective underlying § 1322(b)(2)'s antimodification provision.
*597 D. Section 1322(b)(2) precludes the modification of Creditor's claim.
Turning to the facts of this case, Creditor "bears the burden of proof to show by a preponderance of the evidence that its claim falls within the anti-modification exception of § 1322(b)(2)." In re Snowden , 546 B.R. 39, 44 (Bankr. E.D. Ky. 2016) (internal quotation marks and citations omitted); see also In re Berkland , 582 B.R. at 576 (same as relates to the anti-modification provision of § 1123(b)(5) ). The parties waived the evidentiary hearing scheduled in this case and instead submitted this matter to this Court on the briefs, stipulation of facts and stipulated exhibits.
The parties' dispute centers on whether any of the following factors remove the Creditor's claim from the protections of § 1322(b)(2)'s anti-modification provision: (1) the Property serves as the Debtors' sole place of business for the child care facility that they operate; (2) the Debtors rent a separate structure on the Property to a third-party and receive rental income; and, (3) Creditor's claim is secured by multiple parcels of real property.
The first two factors relate to the mixed-use property issue. Under the approach adopted by this Court, the fact that the Debtors operate a business from their home does not exclude Creditor's claim from the anti-modification provision of § 1322(b)(2) simply because the Property also serves additional purposes. See In re Wages , 508 B.R. at 168. Similarly, the fact that the Debtors rent a separate structure on the Property to a third-party and receive rental income, in and of itself, does not preclude application of the anti-modification provision to the Creditor's claim. See In re Brooks , 550 B.R. at 26.
The third factor, however, goes to whether Creditor's claim is secured by collateral in addition to the real property that is the Debtors' principal residence, in which case the antimodification provision would not apply. The Debtors asserts that Creditor's claim is secured by additional collateral-namely, a second parcel of land that is not the Debtors' residence. The Debtors note that the parties have in fact stipulated that Creditor's claim is secured by two separate parcels [Docket Number 41, p.7 (citing to Docket Number 24, Line 5) ].
As the Creditor properly notes, however, "[t]he fact that a debtor's home sits on a large tract or multiple lots does not automatically lead to a conclusion that the claim is secured by more than just the personal residence." In re Snowden , 546 B.R. at 44 (collecting cases). The determination of whether multiple parcels of real property constitute a debtor's principal residence "is a fact-intensive analysis." Id.
Creditor argues that both parcels of real property securing its claim are the Debtors' principal residence based on evidence in the record characterizing the parcels as one residential property. In particular, Creditor asserts that the Debtors' schedules in this case and their prior chapter 7 case, together with the Appraisal and the "tax records" establish that the Debtors' principal residence includes both parcels.
First, Creditor notes that in the Debtors' prior chapter 7 case, the Debtors scheduled the Property as their residence and claimed the homestead exemption on Schedule C [Docket Number 42, p.2]. Similarly, Creditor observes that the Debtors claim a homestead exemption on Schedule C in this case [Docket Number 42, p.8; Docket Number 45, p.1].
In response, Debtors explain that the Property was scheduled together in their current case as an "administrative convenience"
*598 because both parcels are collateral for the Creditor's claim [Docket Number 44, p.4]. The Debtors point out that it is clear from their schedules in this case that their residence is separate from the second parcel because the schedules expressly state that the Debtors' residence is "valued together with adjoining parcel on SR 775" [Docket Number 44, p.5]. With respect to the exemption issue, Debtors state that Creditor has not offered any proof that Debtors intended to claim their homestead exemption against anything other than the portion of the collateral that holds their principal residence [Docket Number 44, p.5]. Regardless, Debtors maintain that the exemption issue is "nullity" because there is no equity in the Property [id. ].
This Court finds that the manner in which the Debtors scheduled the Property in their prior chapter 7 case and this case in and of itself is not conclusive as to whether both parcels securing Creditor's claim are the Debtors' principal residence for purposes of § 1322(b)(2). While the Debtors did in fact check the box identifying the Property as a "single-family home" in Schedule A/B in the Debtors' prior case, they went on to identify and value the parcels separately as follows:
Parcel No: 32-018-1301.000-$11,830.00
Parcel No: 32-018-1500.000-$98,720.00
[Creditor's Ex. B, p.10]. Further, Creditor's assertion that the Debtors claimed a homestead exemption for the Property in their prior case is incorrect. The Debtors claimed no exemption for the Property in their prior case. [Id., p.16-17]. The Debtors' schedules in their current case are similarly inconclusive regarding whether the additional parcel is part of the Debtors' principal residence. This Court notes that the Debtors did not check a box on Schedule A/B in their current case describing the nature of the Property [Docket Number 1, p.10]. This Court further observes that the Debtors value the Property at $122,000 on Schedule C in their current case and only claim a homestead exemption in the amount of $100,000 [Docket Number 1, p.16], which could support the Debtors' argument that they were only claiming an exemption in the portion of the Property that is their residence.
Next, Creditor maintains that the Appraisal "values the lots as essentially one, listing only the total value in its appraisal report" [Docket Number 42, p. 8]. Creditor further notes that the Appraisal itself is a residential appraisal [id. ]. As with their schedules, the Debtors respond that they obtained a single appraisal "for consistency's sake" since both parcels secure Creditor's claim [Docket Number 44, p.5].
This Court finds Creditor's arguments regarding the Appraisal to be similarly inconclusive. The Appraisal merely establishes the value of the collateral securing Creditor's claim. The fact that it is a "residential" appraisal is unavailing. As Creditor argues and the tax records confirm, both parcels are residential property [Creditor's Ex. A]. As such, the fact that the Appraisal values the parcels as such does nothing to establish that the second parcel is also the Debtors' principal residence.
Finally, Creditor argues that "the tax records show the property is used as a single-family residence and residential vacant land" [Docket Number 45, p.1 (referencing Creditor's Ex. A) ]. Debtors counter that the tax records "tell a very different and far more convincing story" [Docket Number 44, p. 5]. They maintain that the tax records show that the Debtors' residence sits solely on parcel no. 32-018-1500.000 ("Parcel # 1") while the separate structure that is rented to a third-party is located on parcel no. 32-018-1301.000 ("Parcel # 2") [id.].
While Creditor could have painted a clearer picture supporting the Debtors'
*599 residential use of the second parcel, this Court finds that the tax records together with other evidence in the record are sufficient to establish that the both parcels serve as the Debtors' principal residence. The tax records show that the house, which is on Parcel # 1, was built in 1966 [Creditor's Ex. A, p. 1]. Parcel # 2 includes a storage shed, which was also built in 1966. Parcel # 2 also includes the garage[6] with the attached rental unit and another storage shed, which were all built in 1976 [id. , p. 5].[7] The tax records, as well as the deed, reflect that the Debtors acquired both parcels in the same conveyance on October 9, 1996 [Creditor's Ex. A, Debtors' Ex. A]. The fact that all of the out-buildings are located on Parcel # 2, including the only garage on the Property [Appraisal, pp. 4, 11], suggests that the two parcels were acquired to be used as one residential property. See In re Beckford , 247 B.R. 27, 30 (Bankr. D. Conn. 2000) (finding that the "location of the driveway and off-street parking area supports the conclusion that, although the house may be located within the confines of one lot, both lots have been used together as one residence.").
The configuration of the two parcels likewise suggests that the two parcels are one integrated property. The second parcel is in a u-shape that completely surrounds the parcel containing the Debtors' house. The Debtors' house appears to be positioned right on the edge of both parcels such that the inability to use Parcel # 2 would impair the Debtors' use and enjoyment of their house on Parcel # 1. As such, the layout of the parcels suggests that Parcel # 2 serves more as an "expanded backyard" than as a separate and distinct property. See In re Frank , 2014 Bankr. LEXIS 4467 at *13, 2014 WL 5395857, at *5 (Bankr. E.D.N.C., Oct. 23, 2014). Drawing reasonable inferences from the record before this Court, it is difficult for this Court to find that the Debtors do not use Parcel # 2 as part of their principal residence.[8]
For the foregoing reasons, this Court finds that Creditor's claim is secured only *600 by a security interest in real property that is the Debtors' principal residence and, as such, is protected by the anti-modification provision of § 1322(b)(2). Accordingly, Creditor's objection to the Debtors' proposed plan is sustained.
By separate order, this Court will give the Debtors twenty-one (21) days to file an amended plan consistent with this decision.
SO ORDERED.

At the time of the stipulations, Creditor was in the process of completing its appraisal of the subject Property, which the parties had contemplated being Joint Exhibit 2. For the reasons stated in this Court's Order Denying U.S. Bank Trust, NA's Motion to Obtain Appraisal Out of Time [Docket Number 34], Creditor's request to obtain its own appraisal of the Property was denied.

Use of the terms "Bankruptcy Code," "Section" or "§" are references to provisions of Title 11 of the United States Code.

The Debtors argue that the Court of Appeals for the Sixth Circuit rejected this approach in Reinhardt v. Vanderbilt Mortg. & Fin., Inc. (In re Reinhardt) , 563 F.3d 558 (6th Cir. 2009). The issue in Reinhardt was whether the antimodification provision applied to a loan secured by a mortgage on real property and a security interest in a mobile home that was the debtors' principal residence. Id. at 560-61.
The creditor in Reinhardt argued that "the logical reading of § 1322(b)(2) in light of the [definition of a 'debtor's principal residence' in] new § 101(13A) is that to get the benefit of § 1322(b)(2) a creditor must have a security interest [t]hat contains the debtor's principal residence[.]" Id. at 563 (internal quotation marks omitted) (emphasis in original). The Sixth Circuit responded by stating "[t]hat [the creditor] has to adjust the wording of the statute to reach its desired result shows the error of its interpretation." Id.
In rejecting the creditor's argument, however, the Sixth Circuit's point was that the debtor's personal residence must actually be real property for the anti-modification provision to apply-not simply sit on real property. Id. at 563. Because, a mobile home is not real property under applicable Ohio law, the Sixth Circuit held that the antimodification provision did not apply. Id. at 564-65.
In this case, the parties do not dispute that the Debtors' principal residence is real property. Reinhardt did not address the question of whether real property this is a debtor's principal residence but also serves other purposes is outside of the scope of the anti-modification provision.

As one court observed:
[A] precise definition [of the anti-modification provision], even if arbitrary, is exactly what is needed to avoid disruption in the home mortgage capital market. Uncertainty is the one thing that all markets hate. Markets work best when there are clear rules consistently applied. Although investors certainly value fairness, they place an even higher value on certainty. Investors can adjust for inequities. It is much harder to adjust for uncertainty.
In re Bulson , 327 B.R. at 842.

This Court recognizes that in the non-mixed-use context, it is still possible for a debtor to manipulate the applicability of the anti-modification provision by moving to a new residence pre-petition but "[a]ny approach to this issue that one takes is subject to [potential] manipulation." In re Brinkley , 505 B.R. at 213.

From the pictures in the tax records, it appears that part of the garage is on the same parcel as the Debtors' home, which if true would further substantiate the conclusion that both parcels are used by the Debtors' as their principal residence. Creditor, however, did not make this argument so this Court is not making a factual finding to that effect nor is this Court considering this apparent overlap as a part of this decision.

There are three tax cards for Parcel # 1 and one tax card for Parcel # 2. Consistent with the parties' arguments, the pictures in the tax cards reflect that the Debtors' house is located on Parcel # 1 and the out-buildings are located on Parcel # 2 [Creditor's Ex. A]. As noted in the Appraisal, the pictures also show the Debtors' daughter's mobile home is located on Parcel # 2.
The description in the tax cards, however, is less clear. Card 1 for Parcel # 1 describes the Debtors' house, additions to the Debtors' house, and improvements that appear to relate to the daycare playground area as being part of Parcel # 1 [id. , p. 1], which is consistent with the pictures and the parties' positions. Card 3 for Parcel # 1, however, describes the garage with attached unit and the two storage sheds as being part of Parcel # 1 as well [id. , p. 5]. It is not entirely clear which portions of the Property are described in the remaining two tax cards.
For purposes of this decision, this Court will focus its analysis on the location of the structures as shown in the pictures because it is consistent with the parties' positions. If given consideration, however, the narrative description in the tax cards would support this Court's determination that both parcels are part of the Debtors' principal residence.

Given the scarcity of facts regarding the Debtors' actual personal use of the second parcel, this Court will entertain a motion to re-consider if the inferences this Court has drawn from the record are incorrect.